### Pownal Development Corporation v. Pownal Tanning Co., Inc., Staff Indus., Inc., Vermont Agency of Natural Resources, and Vermont Department of Taxes

[765 A.2d 489]

No. 98-577

Present: **Morse, J., and Katz, Supr. J., Teachout, Supr. J., Allen, C.J. (Ret.), and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed November 17, 2000

*James J. Cormier, Jr.*, of *Cormier and Cormier*, Bennington, for Plaintiff-Appellee.

*William H. Sorrell*, Attorney General, and *John H. Hasen* and *Mark J. Di Stefano*, Assistant Attorneys General, Montpelier, for Defendant-Appellant Agency of Natural Resources.

*David W. Gartenstein* of *Downs Rachlin & Martin, PLLC*, Brattleboro, for Intervenor Town of Pownal.

**Katz, Supr. J.** This appeal brings together hoary principles of foreclosure law with contemporary concerns regarding polluted land. The State appeals the trial court's decree of partial foreclosure, arguing that permitting the mortgagee to foreclose on nine valuable parcels, and leave a tenth polluted lot behind, is both inequitable and impermissible under the common law and also contrary to Vermont's Waste Management Act. See 10 V.S.A. §§ 6601-6632. We affirm.

For decades, Pownal Tanning Co. permitted industrial waste to spill about its mill site (the Mill Lot), including the bed of the Hoosic River in Pownal, Vermont. That site eventually was included on the federal "Superfund" list, through which it has received clean-up actions, presumably at great expense. The State of Vermont received a payment from the tannery, which it holds in escrow for further cleanup. The tannery ceased doing business in 1990. In 1984, it

borrowed a sum from First National Bank of Boston, giving as security a mortgage on ten separate, pre-existing, mostly noncontiguous parcels, one of which is the Mill Lot.[1] In 1995, long after the tannery's default and demise, plaintiff Pownal Development Corp. bought the mortgage note and guaranty at a substantial discount. It then initiated the present foreclosure on nine of the ten mortgaged parcels, purposely omitting the polluted Mill Lot. The State of Vermont Agency of Natural Resources was named as a defendant in the underlying foreclosure action in part because it possesses a subordinate judgment lien on the Mill Lot for monies already expended to investigate and undertake waste removal at the site.

The Bennington Superior Court granted a decree of foreclosure. This appeal followed.

## I. Partial Foreclosure Under the Common Law

We first consider the State's claim that plaintiff's partial or selective foreclosure of less than all the mortgaged property is not permitted under the common law.

Quite simply, the State has cited no authority for the proposition that a foreclosing mortgagee must seek to recover all mortgaged lands or none at all. We conclude that that is not the law, either in Vermont or anywhere, and never was. Indeed, all the authority cited by the State implicitly supports quite the opposite conclusion: A foreclosing mortgagee may determine to recover some, but not all, the lands to which it might be entitled under its mortgage instruments.

More specifically, the authority gathered by the State supports the conclusion that a foreclosing mortgagee may not enjoy its remedy piecemeal — foreclosing on some of the property at first, and more at some later time. For example, in *Layden v. Layden*, 44 S.E.2d 340, 342 (N.C. 1947), the court held that "[t]he law does not recognize partial foreclosure." *Id.* (internal citations omitted). Having so stated, however, the *Layden* court went on to elaborate: Once the mortgagee chooses to foreclose partially, "[s]uch an election releases the remainder of the pledged property from the lien of the foreclosed instrument," even if the foreclosed parcels are not sufficient to extinguish the entire debt. *Id.* In other words, a foreclosing mortgagee is *not*

---

[1] The parties disputed whether Lot 1A is contiguous with Lot 3, the Mill Lot. The trial court concluded that the parcels are contiguous, see discussion *infra*, Part III. This conclusion was not appealed.

prohibited from making a deliberate decision not to foreclose on all possible parcels in the first place. But should it make such a decision, it is *thereafter* barred from seeking additional satisfaction of its underlying debt.

This principle has been recognized in other jurisdictions as well. See, e.g., *Bankers Trust Co. v. G. H. Equities, Inc.*, 394 N.Y.S.2d 30 (App. Div. 1977) (assignor of mortgage waived any right to parcel of land when he excluded such parcel in his own foreclosure action); *Bodner v. Brickner*, 288 N.Y.S.2d 342, 346 (App. Div. 1968) (failure in mortgage foreclosure proceeding "to proceed against all the security is an abandonment of the lien on portion omitted"); *Dooly v. Eastman*, 68 P. 1039, 1043 (Wash. 1902) ("One having a mortgage on several pieces of land to secure the same debt cannot foreclose it by piecemeal, and if he attempt to do so he waives his lien upon the premises not included in the decree."). Here, there is no question that plaintiff Pownal Development has made its election and understands that it will have to live with it; having determined to leave untouched the polluted Mill Lot, it later will not be able to recover it.

Beyond mere sanction by negative implication, however, the common law sometimes commands partial foreclosure under the doctrine of marshalling, an equitable principle requiring a mortgagee, in cases of a mortgage secured by several parcels of real estate, to foreclose first on those parcels that do not secure junior encumbrances. See *New Milford Sav. Bank v. Jajer*, 708 A.2d 1378, 1385 (Conn. 1998). In *New Milford*, the Connecticut court relied on the Restatement (Third) of Property:

> [W]hen foreclosing a *mortgage covering more than one parcel of real estate*, upon the motion or application of the holder of a subordinate interest protected by this section, the mortgagee must proceed against the parcels in the following order:
>
> (1) parcels on which no subordinate interests exist are foreclosed upon before parcels on which subordinate interests exist; and
>
> (2) as among parcels on which subordinate interests exist, those with subordinate interests created more recently are foreclosed upon before those with subordinate interests created at a more remote time.

*Id.* at 1385 n.18 (emphasis added) (quoting Restatement (Third) of Property, Mortgages § 8.6, at 633 (1997)). Although the present

foreclosure is one in which the State holds a lien on the Mill Lot junior to that of plaintiff, the State has not of course requested plaintiff to so proceed. For in this case, the unfortunate reality is that no party wants to be left holding the polluted Mill Lot, which is surely worthless, and may well burden its owner with immeasurable future clean-up liabilities. Nevertheless, the point is made: partial foreclosure, as described above, sometimes is required of the mortgagee.

The court explained in *New Milford* that its decision was based on the public policy consideration that an "unconditional ban on partial foreclosures might well disserve all the interested parties because 'requiring foreclosure upon all properties would needlessly involve the additional properties in litigation.'" *Id.* at 1385 (quoting *Michigan Nat'l Bank v. Martin,* 172 N.W.2d 920, 922 (Mich. Ct. App. 1969). Here, a different but equally strong public policy consideration requires the conclusion that partial foreclosure is permissible. The polluted condition of the Mill Lot makes it something of an untouchable. Were the law to hold that plaintiff mortgagee must take "all or nothing," it would extend the pall from that unfortunate Mill Lot to the remaining eight hundred and thirty acres of forest. They all would remain under the lien of plaintiff's mortgage, but also under the potential clean-up obligation toward which the State so clearly looks. In such a state, they all would be frozen in inutility. They could not be sold, leased for the long term, and perhaps not even logged without risk of offending the rights of the State as junior lienholder. Such an unfortunate result would of course be at loggerheads with the law's venerable policy of free alienability of land. See, e.g., *Colby v. Colby,* 157 Vt. 233, 236, 596 A.2d 901, 902 (1991) ("restraints on alienation are not favored"); *Bogie v. Town of Barnet,* 129 Vt. 46, 48, 270 A.2d 898, 900 (1970) (citing the "policy in support of ready alienability of title to good faith, third party purchasers for value"). Were the unpolluted forest lands burdened with the possible future obligations of the Mill Lot, the public as well as the mortgagee would be denied their benefit, and the Town the resultant property taxes. That is why the law favors the free alienability of land, and why any prohibition of partial foreclosure would disserve the public interest.

■ We therefore hold that the common law imposes no bar against plaintiff's foreclosure of some, but less than all, of the property on which it holds a mortgage.

## II. Equitable Considerations

The State next challenges foreclosure by arguing that it would be "inequitable" under the circumstances. Of course, the foreclosure of mortgages is an equitable remedy, see *Merchants Bank v. Thibodeau*, 143 Vt. 132, 133, 465 A.2d 258, 259 (1983), and thereby subject to the considerations inherent in the exercise of a court of equity's historic jurisdiction. See *Merchants Bank v. Lambert*, 151 Vt. 204, 206, 559 A.2d 665, 666 (1989). That said, the State points to no facts that would cause a court of equity to deny plaintiff the remedy it seeks here.

■ The State contends first that plaintiff purchased the mortgage with knowledge of the pollution at the Mill Lot. Plaintiff's purchase, however, did not put the State in a worse position than it would have enjoyed had the original mortgagee retained the lien. Moreover, in cases involving interests in real property, courts make decisions on the basis of matters of record, rather than the personal situation of one or another party to a transaction. See *San Remo Realty Corp. v. City of Montpelier*, 130 Vt. 607, 612, 298 A.2d 810, 813 (1972) (where trial court resorted solely to documents of record in determining ownership, "the spirit and intent of our recording statutes and . . . [the] public policy respecting reliance upon the land records" were not violated.). We therefore perceive no relevance to the fact that plaintiff may have known of the mill's pollution.

■ At oral argument, the State added to its claim of "inequity" by stating that refusing plaintiff the partial foreclosure remedy it seeks would "force it to the table" to negotiate with the State. We merely note that any obligation to negotiate with the State must be founded on some legal obligation running from plaintiff for the benefit of the State. Under the common law, plaintiff, as purchaser of the senior lien, owes no substantive duty to the State as holder of a junior encumbrance. Likewise, we conclude that 10 V.S.A. § 6615(h), a mechanism which allows secured lenders, upon foreclosure, voluntarily to enter into agreements with the State for the purpose of limiting liability on contaminated property, does not imply further that lenders, such as plaintiff, have an equitable duty to bear any clean-up costs for polluted property they do not seek to foreclose on. Consequently, if plaintiff owes no duty, it has no duty to negotiate.

■ The State next argues that because plaintiff purchased its mortgage at a substantial discount, it also acquired the clean-up obligation. This must be recognized as an irrelevant consideration.

First, neither the State nor the public are in any way disadvantaged for dealing with plaintiff, as successor mortgagee, rather than the original grantee of that instrument. Second, at what point would the law hold that too much of a discount is inequitable? Finally, just as the law favors the alienability of title to real estate, it should also favor the alienability of mortgages. When potential lenders know that they may sell freely their security on the open market, as well as foreclose in the event of default, the law renders it more attractive for them to lend in the first instance. The principle is well established that Vermont property owners and businesses will be benefitted by legal doctrine that encourages the lending of money. Similarly, the fact that plaintiff may have recovered its discounted purchase cost already by foreclosing on nearby lands in New York is also irrelevant.

■ The State's final argument that equity should bar plaintiff from the relief it seeks is that it is unfair to permit it to "cherry pick" the valuable lands, and walk away from the cost of cleaning up the polluted Mill Lot. Citing *In re Great Waters of America, Inc.*, 140 Vt. 105, 109, 435 A.2d 956, 959 (1981), the State argues, in effect, that plaintiff "'must take the bitter with the sweet.'" (quoting *Arnett v. Kennedy*, 416 U.S. 134, 154 (1974)). But plaintiff, as holder of a loan instrument, bears no responsibility for the pollution here. Its benefit is no different from that of other members of the public, particularly other adjacent landowners. As the arm's-length purchaser of a mortgage covering polluted property, long after the pollution was in place, plaintiff cannot be held vicariously liable for causing it in the first place. Were our conclusion otherwise, no institution would lend funds to a business for the purpose of cleaning up a polluted site. Tarring plaintiff with responsibility for cleaning up what it never dirtied serves no equitable purpose.

### III. Waste-Management Statute

Finally, in its counterclaim and as an alternative theory of liability, the State maintains that Vermont's Waste Management Act, see 10 V.S.A. §§ 6601-6632, requires that, even if partial foreclosure were upheld, plaintiff still should be held liable for remediation of the Mill Lot. In general, a secured lender, "holding indicia of ownership in a facility primarily to assure the repayment of a financial obligation," cannot be held liable as an owner or operator of contaminated property. 10 V.S.A. § 6615(g)(1)(A) (the safe harbor provision). The State, however, contends that this secured-lender exemption does not

apply in this instance. It argues that, by obtaining title to a contiguous parcel of land, Lot 1A, plaintiff is liable for remediation costs associated with the Mill Lot. This liability is premised on the State's assertion that the Mill Lot and Lot 1A are part of the same "facility." *Id.* § 6602(10). Thus, by foreclosing on Lot 1A, plaintiff necessarily became the owner of, and thereby liable for, the entire facility, including the Mill Lot. See *id.* § 6615(a)(1) (facility owners and operators are liable for remediation).

Under the Act, "'[f]acility' means all contiguous land, structures, other appurtenances, and improvements on the land, used for treating, storing, or *disposing* of waste. A facility may consist of several treatment, storage, or disposal operational units." *Id.* § 6602(10) (emphasis added). "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any ground or surface waters." *Id.* § 6602(12).

The parties stipulated that "[w]aste from the Mill Lot was not disposed of on the lands of Lot 1A . . . which lie to the west of the west bank of the Hoosic River." Rather, waste water was discharged, first directly (prior to 1962) and then indirectly (after 1962), through a series of lagoons, into the river from a portion of the east bank. This "easterly bank of the Hoosic River from which the eventual waste water was discharged from lagoon 5 is situated within the boundaries of Lot 1A." As a result of this discharge, "there are elevated levels of lead and chromium in the riverbed within the boundaries of Lot 1A." At this time, however, "remediation of that portion of the Hoosic River within Lot 1A is not necessary and will not be undertaken by the State."

The trial court concluded that Lot 1A and the Mill Lot are contiguous because the two parcels abut each other. See, e.g., *Route 4 Assocs. v. Town of Sherburne Plan. Comm'n*, 154 Vt. 461, 462, 578 A.2d 112, 113 (1990) (contiguous means "touching"). The trial court, however, did not address the issue of whether the disputed lots constitute a "facility" under § 6602(10).[2] Although the trial court does not appear to have ruled on the State's counterclaim, per se, by

---

[2]The trial court's conclusory statement that the parcels "are portions of one facility that falls under single ownership," until one of the parcels is foreclosed, does not reveal a § 6602(10) analysis.

issuing a decree of foreclosure, that claim was rejected implicitly. Moreover, no party on this appeal argues that pertinent facts went unresolved, requiring a trial below. Hence we are left with the duty to apply the law to the agreed facts. See *DeWitt v. Brattleboro Zoning Bd. of Adj.*, 128 Vt. 313, 324, 262 A.2d 472, 478 (1970) (where parties do not contend that there is shortage of facts, and sufficient undisputed facts permit resolution of issues, we must "apply the applicable law to these undisputed facts").

■ Putting aside for the moment questions of ownership, Lot 1A could be considered a facility under § 6602(10). It is contiguous to the Mill Lot, and was used in a broad sense in the disposing of waste, as some of that material evidently passed through it in earlier periods. This was, of course, long before plaintiff mortgagee had any interest in Lot 1A. As a mere mortgagee, plaintiff is a "secured lender" subject to the safe harbor provision of § 6615(g)(1)(A). The State concedes as much.

■ Once a mortgagee commences foreclosure, it is still only a secured lender. The State's counterclaim must set forth "any claim which at the time of serving the pleading the pleader has against any opposing party." V.R.C.P. 13(a). The State has not shown what claim it had, under the waste-management statute, at that time. At a later time, after the decree of foreclosure becomes choate by expiration of rights of redemption, plaintiff will become the owner of Lot 1A. Whether it thereby becomes liable in some way for being the owner of that lot is not for determination at this time. We may decide only claims pending between parties, not all possible future claims. See *C. V. Landfill, Inc. v. Environmental Bd.*, 158 Vt. 386, 391, 610 A.2d 145, 148 (1992) (noting the "general jurisdictional prerequisite that a court exercise its power to resolve only real disputes — cases and controversies — as opposed to issuing advisory or hypothetical opinions") (internal quotation marks omitted).

*Affirmed.*