2013 VT 12

# David Prue and Barbara Prue v. Larry C. Royer, Sr. and Department of Liquor Control

[67 A.3d 895]

No. 11-417

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed February 15, 2013

270

*Paul R. Morwood*, South Burlington, for Plaintiffs-Appellants.

*Jennifer E. Nelson* of *Law Office of Jennifer E. Nelson, P.C.*, Newport, for Defendant-Appellee/Cross-Appellant.

¶ 1. **Dooley, J.** The parties in this case entered into a real estate agreement nearly thirteen years ago, and this case requires us to determine its repercussions. The trial court concluded that the agreement constituted a contract for deed and that the purchasers had therefore acquired an equitable interest in the property in question. The court initiated a foreclosure on that interest, even though it had not been pled. Plaintiffs, the purchasers as found by the superior court — David and Barbara Prue, appeal from the foreclosure. Defendant, the seller as found by the court — Larry Royer, appeals from the court's conclusions that the contract was an enforceable contract for deed. We affirm the court's conclusion that the parties entered into a contract for deed, and that it was enforceable, but reverse the foreclosure decree as premature.

¶ 2. Plaintiffs, Barbara and David Prue, were friends with Larry Royer, defendant, and his now-deceased wife. The Royers owned a bar in Irasburg known as the Brewski Pub. In 1999, plaintiffs, along with a friend,[1] began discussing with the Royers the possibility of purchasing or taking over the operation of the bar.

¶ 3. In January 2000, these discussions produced an agreement, which was memorialized in a document drafted by the Royers' real estate agent. At the time, the real estate agent encouraged the parties to hire an attorney to draft the proper documents. When they did not follow that advice, the agent included a provision that she would be held harmless for any disputes that might arise. As the events unfolded, it became clear that the parties should have listened to the real estate agent.

¶ 4. This case arises out of the lack of clarity in the parties' agreements. The primary agreement is completed on a realtor preprinted contract entitled "Purchase and Sale Contract," but "Lease-Option to Purchase" is handwritten below that title. On

---

[1] The friend was a party to the original agreement, but ceased to be involved after a few months and is not involved in this litigation.

this form contract, the purchase price is listed as $190,000, and $4000 is entered as the deposit. In the blank for an additional deposit, an annotation is entered to see the attached schedule. In the blank for a closing date is written: "proposed 6 years from date of all signatures to this contract."

¶ 5. The preprinted terms of the contract are those for the sale of property. The first section is headed "Agreement of Sale and Purchase" and states, "Purchaser hereby offers and agrees to purchase from Seller and Seller agrees to sell and convey to Purchaser the Property described herein at the price and on the terms and conditions stated in this Contract."

¶ 6. A separate page entitled "Financing Property Agreement" is attached. This agreement states that the price of the real estate is $175,000, plus $15,000 for equipment, for a total price of $190,000. Beneath this is listed a schedule of payments. The schedule lists three down payments, one at signing and one each in April and June 2000. The one at signing is labeled an "option down payment." In between these down payments, the schedule lists twelve monthly "rental" payments of $1000. For each down payment, "-$4000" is entered below the sale price. The bottom of the schedule reads "1/1/01 Balance due is . . . $178,000." Following this, the financing agreement reads "Buyer/Leasee will pay starting 1/1/01, $1,400 per month for 5 years with an interest payment of 1 over the nation's prime rate and a balloon due of all principle and interest on 1/1/06."

¶ 7. Also attached is an addendum, referring to "Buyers" and "Sellers" throughout. The addendum specifies that plaintiffs are responsible for operating licenses, any property or equipment damage, septic and spring operations, utility payments, and real estate taxes. The addendum also requires that "during lease agreement" defendant's approval be obtained prior to any renovations. Finally, the addendum requires that plaintiffs have fire insurance, theft insurance, and proof of one million dollars of liability insurance "before business opening," and that defendant be "named as lien holder[]."

¶ 8. This arrangement went forward apparently without difficulty for several years. The record suggests that, at points after the first year of the agreement, plaintiffs missed some payments, but that defendant either forgave or put off these payments. In 2004, the parties agreed that an addition would be built. Defendant paid for the addition, and the price was added to the principal

balance due from plaintiffs. In June 2004, the parties signed an amortization schedule calling for a new balance of $253,549, amortized over twenty-five years. This amortization schedule did not address the balloon payment provision in the original agreement.

¶ 9. In 2006, after the contemplated balloon payment date had come and gone, defendant sought to complete the transfer, but plaintiffs informed defendant that they would be unable to do so. The trial court found that plaintiffs probably were not sufficiently creditworthy to qualify for a bank loan at that time. Nevertheless, plaintiffs remained in possession of the bar and continued to make monthly payments. In August 2006, the parties drew up and signed a new payment schedule, shifting to weekly payments that would run through 2018.

¶ 10. The arrangement began to really unravel as the result of issues with the insurance coverage. The bar, renamed Kingdom's Playground by plaintiffs, was described by the trial court as a "rowdy place." In 2004, both plaintiffs and defendant were named as defendants in a lawsuit under Vermont's Dram Shop Act, 7 V.S.A. § 501. As a result, defendant learned that he had not been named as the lienholder on plaintiffs' liability insurance. He also learned that the policy provided plaintiffs only $100,000 in liability coverage. Both of these inadequacies in the policy appeared to contravene the addendum to the parties' original contract, and defendant pressed plaintiffs to correct them.

¶ 11. The insurance issues came to a head in early 2007 when gunshots were fired at the bar. Another area bar had recently been the scene of a stabbing. The gunshots attracted the attention of the state liquor inspector, who began inquiring whether plaintiffs had an active lease as required by state law. See 7 V.S.A. § 222. Neither plaintiffs nor defendant were able to find a copy of their original agreement. The inspector told plaintiffs that they would have to stop operating the bar if they did not have a lease. Plaintiffs' last monthly payment was made in mid-January 2007.

¶ 12. On March 8, 2007, plaintiffs tendered their liquor license to the state inspector and started removing property from the bar. The trial court found that plaintiffs took some equipment that was present when they took possession of the premises and liquor that was part of the original inventory. The trial court also found that the property was left damaged and messy, requiring defendant to expend repair and clean-up costs.

¶ 13. Although plaintiffs testified that they were under the impression that defendant was shutting them down, the trial court found that defendant did not do anything to evict them. The court found that plaintiffs voluntarily surrendered possession out of frustration with the state liquor control issues, their poor income, and defendant's demand that they provide more liability coverage.

¶ 14. Not long thereafter, however, plaintiffs sought to be restored to possession. After consulting an attorney, plaintiffs learned that their rights in the premises might not be merely those of lessees. On March 29, 2007, they initiated this action, seeking a declaration that they hold equitable title to the property as well as money damages. Defendant counterclaimed for breach of contract and unjust enrichment, seeking back rent and damages based on the missing items and the clean-up costs.

¶ 15. The central question before the trial court was how to characterize the contractual arrangement between plaintiffs and defendant. Plaintiffs characterized the agreement as a contract for deed, such that they acquired equitable title subject to a mortgage. Defendant, in contrast, characterized the agreement as a lease-option contract, such that plaintiffs were only leaseholders until they paid the purchase price.

¶ 16. The trial court accepted plaintiffs' interpretation, holding that the agreement was a contract for deed. As a result, the court concluded that plaintiffs held an equitable interest in the property, and treated the contract as embodying a mortgage. The consequence of this legal classification was that plaintiffs held an equity of redemption, such that the only means to extinguish plaintiffs' interest was foreclosure. On its own initiative, the court commenced such a foreclosure. The court explained, "Although [defendant] has not sought to 'foreclose,' [plaintiffs] have sufficiently pled the issue for the court to enter a foreclosure order if it becomes necessary." Plaintiffs were given fifty-four days — slightly under eight weeks — in which to pay $244,386.86 plus interest to redeem. In the event of nonredemption, plaintiffs were ordered to pay $8136 in damages for personal property, cleaning, and repairs.

¶ 17. Both parties appeal. Plaintiffs argue that the trial court abused its discretion in sua sponte ordering a foreclosure; in the alternative, they argue that the court erred in permitting strict foreclosure, in giving a short redemption period, and in placing the redemption amount too high; and further argue that the trial

court should not have ordered conditional damages for waste. Defendant, in contrast, argues the trial court was wrong to interpret the agreement as a contract for deed, thus incorrectly giving plaintiffs an equitable interest and incorrectly failing to award back rent. He also argues that the two modifications of the agreement in 2004 and 2006 were unenforceable under the Statute of Frauds, and that plaintiffs abandoned their equitable interest, if any existed, when they quit the property. In the alternative, defendant argues that plaintiffs' appeal is not properly before us because plaintiffs did not comply with Vermont Rule of Civil Procedure 80.1(m) by seeking permission from the trial court to appeal within ten days of its order, but that both the foreclosure remedy and the conditional damages for waste awarded by the trial court were appropriate. We deal with each of these questions in turn below.

¶ 18. Our review of the trial court's interpretation of the parties' agreement is nondeferential. See *Dep't of Corr. v. Matrix Health Sys., P.C.*, 2008 VT 32, ¶¶ 11-12, 183 Vt. 348, 950 A.2d 1201 (explaining that we review "the trial court's interpretation of the parties' contract de novo" and seek, "[i]n construing a contract, . . . to implement the parties' intent"). To the extent that it is legally permissible, the trial court's order of foreclosure will be reviewed for abuse of discretion. See *Weed v. Weed*, 2008 VT 121, ¶ 16, 185 Vt. 83, 968 A.2d 310 (holding that equitable remedies are reviewed for abuse of discretion); *Pownal Dev. Corp. v. Pownal Tanning Co.*, 171 Vt. 360, 365, 765 A.2d 489, 493 (2000) ("[T]he foreclosure of mortgages is an equitable remedy . . . ."). In addressing these questions, we accept the trial court's findings of fact as long as they are supported by the evidence. See *Whippie v. O'Connor*, 2010 VT 32, ¶ 12, 187 Vt. 523, 996 A.2d 1154.

¶ 19. We begin by considering the nature of the contract, which means addressing defendant's cross-appeal. Defendant argues that the trial court erred in concluding that the agreement between the parties constituted a contract for deed, arguing instead that it was a lease with an option to purchase. We affirm the trial court's interpretation of the contract.

¶ 20. In interpreting a contract, we look to the intent of the parties as it is expressed in their writing. *Southwick v. City of Rutland*, 2011 VT 53, ¶ 4, 190 Vt. 106, 35 A.3d 113. When a contract is unambiguous, the plain language of the contract

governs its interpretation. *Id.* However, there can be no serious argument that the contract here is unambiguous. Indeed, the ambiguity in this contract begins with the multiple titles on the top of the instrument: "Lease-Option to Purchase" was written by hand on the top of the form contract, right under the generic printed title, "Purchase and Sale Contract." No matter which of the titles could be said to be more authoritative, the title of an instrument is not necessarily determinative. See *Neece v. A.A.A. Realty Co.*, 322 S.W.2d 597, 600 (Tex. 1959) ("While in certain cases, one must consider captions in order to ascertain the meaning and nature of a written instrument, it has been held that the greater weight must be given to the operative contractual clauses of the agreement . . . ."). So, we must look beyond the title to the terms of the agreement to determine the intent of the parties.

¶ 21. A contract for deed is an agreement in which a "prospective purchaser occupies the premises and makes . . . payments until the point of delivery of the deed and execution of the mortgage." *Tromblay v. Dacres*, 135 Vt. 335, 339, 376 A.2d 753, 756 (1977). Such contracts are bilateral: both parties have duties to which they have already agreed and cannot choose not to perform without breaching the contract.

¶ 22. A second important characteristic of a contract for deed is that the payments under such an agreement "are applied to the purchase obligation as they accumulate." *Id.* Therefore, under a contract for deed, there is an "accumulation of an equitable interest in the property that deserves recognition even without the execution of a formal mortgage instrument." *Id.* at 340, 376 A.2d at 756.

¶ 23. A lease option to purchase, on the other hand, is " 'an agreement by which one binds himself to sell and convey to another party certain property at a stipulated price within a designated time, leaving it in the discretion of such other party to take and pay for the property.' " *Buchannon v. Billings*, 127 Vt. 69, 74, 238 A.2d 638, 641 (1968) (quoting *Durfee House Furnishing Co. v. Great Atl. & Pac. Tea Co.*, 100 Vt. 204, 207, 136 A. 379, 381 (1927)). It is a unilateral contract: " 'The optionor is bound that the offer shall be kept open and available in accordance with its terms, but its acceptance rests wholly in the discretion of the

optionee, and there is no obligation upon the latter with regard to it.'" *Id.* (quoting *Durfee*, 100 Vt. at 207, 136 A. at 381).

■ ¶ 24. Besides its unilateral nature, the other main way in which a lease option is distinguished from a contract for deed is that the lease payments are "not . . . applied on the purchase price." *Tromblay*, 135 Vt. at 340, 376 A.2d at 756. Therefore, no equity is accrued. See *Harden v. Vt. Dep't of Taxes*, 134 Vt. 122, 125, 352 A.2d 685, 687 (1976) (citing *LaGue v. State*, 128 Vt. 212, 214, 260 A.2d 387, 389 (1969)).

■ ¶ 25. Defendant maintains that the document in this case was a lease option, where the decision to purchase on January 1, 2006 was "in the discretion" of plaintiffs, and "none of the rental payments were to be applied to reduce the purchase price of the sale." However, despite the confusion produced by this poorly drafted amalgamation of instruments, the weight of the evidence suggests that the instrument has the two crucial characteristics of a contract for deed, rather than a lease option: (1) the contract is bilateral, rather than unilateral, and (2) the payments after January 1, 2001 are meant to be applied to the purchase price.

¶ 26. In relation to the first of those characteristics, the language of the agreement in many instances demonstrates that this was a bilateral contract.[2] The first clause of the agreement states: "Purchaser hereby offers and agrees to purchase from Seller and Seller agrees to sell and convey to Purchaser the Property described herein . . . ." There is also a clause saying that the offer is open for acceptance until January 2, 2000, and the signatures show that the contract was signed the day after that by all parties. The clause that refers to "Purchaser's obligation to close under this contract," subject only to a financing contingency, and the clause that states that "This Contract is for the benefit of and is binding upon Seller and Purchaser," represent a mutuality of obligation that belies defendant's argument that this is only an option agreement.

¶ 27. The language that suggests the parties entered into an option agreement is sparse. Defendant particularly points to the designation of the first down payment in the financing agreement

---

[2] We recognize that the many instances are generally in the preprinted language because the realtor used a property purchase and sales agreement as the template for the contract. We do not believe, however, that because the terms are preprinted they are any less binding.

as an option down payment. But beyond that label in one place, the financing agreement does not have words to describe plaintiffs' right as an option. In fact, that agreement is written as a bilateral agreement specifying that after the initial year "Buyer/Lesee will pay starting 1/1/01." The bilateral nature of the agreements weighs strongly in favor of interpreting this instrument as a contract for deed.

¶ 28. Second, the Financing Property Agreement strongly supports the view that the payments after January 2001 will be applied to the purchase price: it states that the balance due (which amounts to the purchase price less the three down payments of $4000), is effective on January 1, 2001, at which point "Buyer/Leasee will pay starting 1/1/01, $1,400 per month for 5 years with an interest payment of 1 over the nation's prime rate and a balloon due of all principal and interest on 1/1/06." Defendant glosses over this clause, stating: "Thereafter, the rent was increased to $1,400 per month." This characterization is erroneous. If the $1400 monthly payments were merely rent, it would be hard to understand the phrase "balance due" on January 1, 2001, the inclusion of interest, or the "principal" that was to be paid in 2006. The trial court found that "the parties appear to have calculated [the amount of $1400] using an amortization schedule with a roughly twenty-year schedule and seven to eight percent interest, which is a reasonable mortgage arrangement." Furthermore, when the parties switched to weekly payments in 2006, the principal was lower than it had been in 2004, which suggests that the monthly payments were being applied to the principal.

¶ 29. Because we find that the contract represented a bilateral agreement to purchase the property, and that the payments after January 2001 went towards the purchase price of the property, we affirm the finding of the trial court that the agreement was a contract for deed, rather than a lease-option agreement. The consequence of this conclusion is that defendant's interest is as an equitable mortgagee, not as a landlord or optionor. We first explained the interests of seller and purchaser in a contract for deed in *Town of Weston v. Town of Landgrove*:

> If Holt, when he purchased his farm, had taken a deed and given back a mortgage to secure the payment of the purchase-money, it could not be denied that he held his

estate in his own right. The conveyance which he in fact took is equivalent to the same thing. It is only a difference in the *form* of the conveyance. Holt, holding under his bond, is, to all intents and purposes, predicable of the statute in question, as much the owner of his farm as he would be, if he had a deed of it. So long as he performs the conditions of his bond, Abbott cannot question his title. Abbott would be a trespasser, like a stranger, if he invaded Holt's possession; and had no more "right" in the farm than a stranger. He had only the rights of a mortgagee before breach of condition.

53 Vt. 375, 378 (1881); see also *Tromblay*, 135 Vt. at 339, 376 A.2d at 756 ("The doctrine of equitable mortgages does apply to agreements denominated as a 'contract for a deed' or, in older usage, 'bond for a deed.' These agreements are entered into, in many instances, where the prospective purchaser cannot raise the difference between the price of the property and an acceptable mortgageable balance. The prospective purchaser occupies the premises and makes the payments until the point of delivery of the deed and execution of the mortgage is reached. Since the payments are applied to the purchase obligation as they accumulate, an equity, though perhaps small, comes into being. It is this interest that is referred to as the equitable mortgage interest that requires foreclosure."); *Aldrich v. Lincoln Land Corp.*, 130 Vt. 372, 374, 294 A.2d 853, 854 (1972) ("The legal title in this lessor is viewed as a security interest held for the payment of the purchase money due, with equitable title in the lessees. Given a breach of the contractual provisions, foreclosure is the remedy." (citation omitted)).

■ ¶ 30. Although Vermont has consistently treated a contract for deed as an equitable mortgage, it has been one of only a small minority of states to do so. See G. Nelson, *The Contract for Deed as a Mortgage: The Case for the Restatement Approach*, 1998 B.Y.U. L. Rev. 1111, 1125. In more recent years, however, a trend has developed consistent with the Vermont view. Thus, the Restatement (Third) of Property: Mortgages § 3.4(b) (1997) provides that "[a] contract for deed creates a mortgage."

¶ 31. Having determined that the agreement was a contract for deed, we turn to defendant's claim that the two modifications in 2004 and 2006 — both of which took the form of amended

payment schedules signed by all parties — are unenforceable under the Statute of Frauds.[3] 12 V.S.A. § 181(5). In support of this contention, defendant relies on *Chomicky v. Buttolph* for the proposition that for a modification of an agreement within the Statute of Frauds to be enforceable, "any proposed changes or modifications 'are subjected to the same requirements of form as the original provisions.'" 147 Vt. 128, 130, 513 A.2d 1174, 1175 (1986) (quoting *Evarts v. Forte*, 135 Vt. 306, 311, 376 A.2d 766, 769 (1977)).

¶ 32. Defendant argues that the 2004 and 2006 modifications do not satisfy the Statute of Frauds, although they are written and signed by all parties, for two reasons. First, defendant claims that they "fail to refer to or describe the property in any manner," and also that they do not refer to or purport to amend the original agreement. Second, defendant argues that since no modified closing date is included in either of the modifications, an essential term is left out, making the agreement as modified incomplete and unenforceable under the Statute of Frauds.

¶ 33. To begin with, defendant is correct that a modification of a contract within the Statute of Frauds must be written and signed to be enforceable. *Evarts*, 135 Vt. at 311, 376 A.2d at 769; see *Secrest v. Sec. Nat'l Mortg. Loan Trust 2002-2*, 84 Cal. Rptr. 3d 275, 282 (Ct. App. 2008) (written modification unenforceable because unsigned by lender). However, the cases that cite *Evarts* for the proposition that "any proposed changes or modifications are subjected to the same requirements of form as the original provisions," including *Chomicky* itself, 147 Vt. at 130, 513 A.2d at 1175, are exclusively those where the modification in question was entirely oral rather than in writing. See *Heathcote Assocs. v. Chittenden Trust Co.*, 958 F. Supp. 182, 186-87 (D. Vt. 1997); *Kingsbury v. Villeneuve*, 144 Vt. 648, 648, 475 A.2d 241, 241 (1984); *North v. Simonini*, 142 Vt. 482, 485, 457 A.2d 285, 287 (1983). The situation is different in this case, where the agreement is written and signed, but does not include all the same specifications as the original agreement because it modifies only a few terms. There is no claim here by either party that the modifications contained oral terms not reduced to writing.

¶ 34. Turning to the first of defendant's arguments — that the modifications do not reference the property or the original

---

[3] All parties agree that the original contract was enforceable.

agreement — other jurisdictions have allowed contract modification to satisfy the Statute of Frauds with rather informal notations, as long as it is clear that the new writing is related to the first. See, e.g., *In re 4Kids Entm't, Inc.*, 463 B.R. 610, 693-94 (Bankr. S.D.N.Y. 2011) (finding that email communications about the terms that were intended to be changed satisfied the Statute of Frauds); *Raleigh Assocs. v. Jackson*, 96 N.Y.S.2d 528, 531 (Sup. Ct. 1950) (declining to find a written modification unenforceable under the Statute of Frauds despite the fact that the corporation to be bound was not named in the modification, because it was "clear from the evidence . . . that [the person who signed the modification] was acting for the benefit of the corporation"). This is an application of a more general contract law principle relating to an agreement composed of various documents, wherein express reference between documents is not required: "If all are signed, the rule generally followed is that all the papers that show by their contents a connection with the agreement sought to be enforced may be taken together though the writings do not refer to each other." 10 S. Williston, A Treatise on the Law of Contracts § 29:31, at 648-49 (4th ed. 1999); see also *Thayer v. Luce*, 22 Ohio St. 62, 74 (1871) ("[I]f the several papers relied on be signed by such party, it is sufficient if their connection and relation to the same transaction can be ascertained and determined by inspection and comparison.").

¶ 35. In this case, there is no doubt that the 2004 and 2006 modifications are intended to refer to and modify the earlier agreement: in both, the parties to the contract are the same, the amount that is to be refinanced is derived from the previous contract, and defendant does not seriously contest that the modifications relate to the ongoing agreement. Therefore, the trial court's finding that the modifications were related to the original contract is supported by the evidence.

¶ 36. In relation to the second issue, defendant relies strongly on *Evarts v. Forte* to argue that the closing date is a material term and must be included in written form to satisfy the Statute of Frauds. Therefore, he reasons, because a modified date is not included in the 2004 and 2006 modifications, neither of those modifications is enforceable. *Evarts* is not a helpful precedent for defendant. In *Evarts*, the seller wished to advance the closing date, and although there was evidence that the purchaser had agreed orally to do so, the purchaser failed to sign the modified

purchase and sales agreement to that effect. Thus, the written agreement that included the earlier closing date was found not to satisfy the Statute of Frauds because it was signed only by the seller; this Court characterized it as a counter-offer rather than a binding contract. *Evarts*, 135 Vt. at 311, 376 A.2d at 769 ("There can be no doubt that in the present case the change in closing date requested by the appellants was, in effect, a counter-offer requiring the appellee's assent."). This precedent is inapposite: not only were the 2004 and 2006 modifications signed by both parties in this case, but to apply *Evarts* to the case at hand presupposes that the closing date was in question and up for change during the 2004 and 2006 modifications. There is no evidence that the parties made an oral agreement to change the closing date or that the closing date was discussed at all. If the modifications were not intended to change the closing date, there would have been no need to include the date in the written documents.

¶ 37. As alluded to above, it is extremely common to have a modification of a contract that changes only certain terms, and that modification would not be expected to include any of the other terms of the original contract. "Where 'two contracts are made at different times, [but where] the later is not intended to entirely supersede the first, but only modif[y] it in certain particulars[,] [t]he two are to be construed as parts of one contract, the later superseding the earlier one wherever it is inconsistent therewith.'" *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1211 (10th Cir. 2009) (quoting *Hawes v. Lux*, 294 P. 1080, 1081 (Cal. Dist. Ct. App. 1931)). Courts around the country accept written modifications even if they relate only to certain terms, as long as it is clear which terms of the contract are being modified. See *In re 4Kids Entm't, Inc.*, 463 B.R. at 693; *In re Estate of Mullen*, No. 298039, 2011 WL 3130044, at *8 (Mich. Ct. App. July 26, 2011) ("Here, there was evidence that the parties mutually agreed that Fr. Mullen would not have to pay interest from a particular date. Carl Fagerman memorialized that agreement on the schedule for the receipt of payments and initialed it. The notation and initials were sufficient to create a binding writing that modified the land contract."). Therefore, the trial court was right to evaluate each of the two modifications to see if there was any reason for a closing date to be included.

¶ 38. In relation to the 2004 modification, the trial court found that it could not "conclude that this document was intended

to reflect an agreement to extend the original purchase date contained in the original 2000 agreement." It found, instead, that the principal was modified merely to reflect the addition that had been put on the building, and thus there would have been no reason to include a closing date in the modification. It is confusing, of course, that the agreement contains a long string of dates that extend past January 1, 2006 — the closing date specified in the initial agreement — but it was not clear error for the trial court to find that this modification did not change the date of the closing, and therefore the omission of a new date in the modification did not mean that an essential element was left out. We note also that in the context of a contract for deed, a closing is a formality that does not discharge or change the rights and responsibilities of the parties unless the purchaser has fully paid the purchase price.

¶ 39. Turning to the 2006 modification, the trial court concluded that, although the closing date had passed, defendant had talked to plaintiffs about whether they would be able to meet the closing date — and then, by coming up with a new payment plan as memorialized in the modification agreement, effectively waived the closing date. Even when a contract is within the Statute of Frauds, a time limitation may be waived without written agreement. *North*, 142 Vt. at 485, 457 A.2d at 286 ("[W]here the parties waive, by their words and conduct, the time limitations of the contract, the nonwritten modification does not violate the Statute of Frauds since waiver and estoppel operate independently of the statute." (citing 6 S. Williston, A Treatise on the Law of Contracts § 856, at 232 (3d ed. 1962))). Therefore, as the closing date had been waived, or even if it was waived by the very execution of the modification, the Statute of Frauds did not require that it be written in the new agreement modifying the payment terms.

¶ 40. Although we affirm the trial court's finding that the two modifications were valid under the Statute of Frauds, it should be noted that such a holding is not strictly necessary in the context of defendant's argument. That is, defendant objects to the use of the modifications as evidence that the original contract was a contract for deed, but does not argue that the contract was unenforceable as modified.

¶ 41. Insofar as the agreement was a valid contract for deed and not unenforceable under the Statute of Frauds, plaintiffs

acquired an equitable interest in the property. Defendant argues, however, that plaintiffs' failure to make payments and their "voluntary abandonment" of the property served as abandonment of their equitable interest. Defendant admits that the question has not been addressed by this Court, but cites cases from other jurisdictions for the proposition that "an unperfected equitable title may be lost by abandonment."

¶ 42. The trial court, acknowledging the absence of precedents in this jurisdiction, applied the principle as derived from other jurisdictions. The applicability of the principle is a question of law that we review de novo, see *State v. Valyou*, 2006 VT 105, ¶ 4, 180 Vt. 627, 910 A.2d 922 (mem.), and we recognize the abandonment doctrine as rooted in common law. See *State v. Jackson*, 40 A.3d 290, 300 (Conn. 2012) (identifying the "common law sense" of the term abandonment as the "voluntary and intentional renunciation of ownership"). Applying the law of abandonment to the facts of the case, the trial court found no abandonment. We review this factual finding for clear error, *First Congregational Church of Enosburg v. Manley*, 2008 VT 9, ¶ 12, 183 Vt. 574, 946 A.2d 830 (mem.), and find none.

¶ 43. Although the trial court found that plaintiffs did stop making payments to defendant and paying taxes in January 2007, and left the property in March 2007, it found nonetheless that plaintiffs did not demonstrate sufficient intent to abandon their rights to the property. This finding was based upon evidence that plaintiffs left the property under the impression that they were to be shut down by the liquor inspector and almost immediately contacted a lawyer in order to ascertain what their rights were. As for the cessation in payments, the court found that this action stemmed from financial difficulties, as well as from the history of friendship between the parties and the fact that a number of missed payments had occurred in the past without the seller taking action, so merely missing payments was not enough to show a clear intent to abandon the property.

¶ 44. The trial court did not err. "A finding of abandonment depends upon the intentions of the parties and is not predicated on any single factor, but on all of the facts and circumstances concerning the owner's relationship with the subject property and the seller." *In re Berman*, 247 N.W.2d 405, 408 (Minn. 1976). Defendant focuses his argument on the undisputed

fact that plaintiffs left the property and returned their keys in March 2007, but that fact does not dictate the result he seeks. As the Kansas Supreme Court noted in *Botkin v. Kickapoo, Inc.*:

> Mere relinquishment of the possession of a thing is not an abandonment in a legal sense, for such an act is not wholly inconsistent with the idea of continuing ownership; the act of abandonment must be an overt act or some failure to act which carries the implication that the owner neither claims nor retains any interest in the subject matter of the abandonment.

505 P.2d 749, 752 (Kan. 1973); see L. Tellier, Annotation, *What Constitutes Abandonment of Land Contract by Vendee*, 68 A.L.R.2d 581, 584-85, § 2 (1959) ("That the vendee under such a contract went out of possession, either by abandonment of the premises, express surrender of possession, or otherwise, may be an element in the determination that he abandoned the agreement, but it does not follow that, regardless of circumstances, his going out of possession constituted an abandonment of the contract."). The focus is on the intent of the purchasers. Here, the trial court found that plaintiffs left under an impression that the liquor department was about to shut down the bar, and, thus, their action in leaving did not necessarily carry the implication that they were abandoning all interest in the property. The trial court's conclusion is supported by the evidence.

¶ 45. Furthermore, because abandonment is the "voluntary relinquishment of a known right," *Kottis v. Cerilli*, 612 A.2d 661, 665 (R.I. 1992), a crucial part of the inquiry is whether the persons thought to be abandoning their right are aware of the effect of their actions. In *Bennett v. Galindo*, No. 94-1101-PFK, 1994 WL 613429, at *7 (D. Kan. 1994), the plaintiffs surrendered their keys "without understanding the import of their actions," and the court declined to find the surrender to constitute actual abandonment of the plaintiffs' equitable interest. Just as in this case, the plaintiffs in *Galindo* did not know of their rights or the effect of their actions on those rights until consulting with a lawyer, and "[i]mmediately upon retaining counsel, the Galindos sought to correct their 'error' by filing an affidavit of equitable interest." *Id.* The principle is the same as in the context of abandonment of personal property. See *Grande v. Jennings*, 278 P.3d 1287, 1292 (Ariz. Ct. App. 2012) ("[T]he facts are undisputed

that the estate did not know that the money was mislaid, and did not intend to abandon the funds. In fact, the evidence is to the contrary; once Grande learned of the discovery, she filed a probate petition to recover the property."). Here, the trial court did not commit clear error in declining to find that plaintiffs relinquished a known right when they left the property.

¶ 46. Another important factor in finding intent that is ignored by defendant is the context of the abandonment of the premises and the actions taken immediately after leaving. Some of the very cases cited by defendant make it clear that in searching for signs of intent to abandon, courts look to parties' actions after leaving a property, including the time elapsed before bringing a claim and the external factors that affect their choice to do so. See, e.g., *Flath v. Bauman*, 722 S.W.2d 125, 128-29 (Mo. Ct. App. 1986) (finding as a factor indicating intent to abandon that "purchaser waited nearly a year to seek enforcement of the contract"); *Hull v. Clemens*, 267 P.2d 225, 233 (Or. 1954) (finding it important to the abandonment analysis that the purchaser left the property in 1942, and that property value rose before the case was brought in 1948: "When that development occurred, Hull bethought the recent past and seemingly looked around in an effort to regain his hold upon the land which a few years previously he had walked away from, but which now gave promise of easy wealth."). Again, the trial court did not commit error in taking into account in its intent analysis the fact that plaintiffs consulted with a lawyer and almost immediately brought suit to recover their interest.

¶ 47. Because there is evidence in the record to support the trial court's findings that plaintiffs could have imagined that the late payments would be forgiven, stopped paying because of financial difficulties, left under the impression that their bar was to be closed by the liquor inspectors, and did not know what the effect of leaving the property would be on their equitable interest, we affirm its holding that plaintiffs did not abandon their interest in the property.

¶ 48. Having concluded that the trial court correctly interpreted the agreement as a valid contract for deed such that plaintiffs hold an equitable interest, we turn to the issues raised in plaintiffs' appeal, focusing on whether the court's foreclosure order was proper. We start with the threshold question of whether

plaintiffs' appeal is properly before us. Defendant argues that plaintiffs' appeal is not properly before us because plaintiffs failed to obtain permission for the appeal from the trial court as required by 12 V.S.A. § 4601: "When a judgment is for the foreclosure of a mortgage, permission of the court shall be required for review."[4] As defendant notes, plaintiffs never sought permission to appeal.

¶ 49. Despite this failure, we conclude that the appeal is properly before us. The issue is controlled by *Herrick's Adm'r v. Teachout*, 74 Vt. 196, 202, 52 A. 432, 434 (1902), which construed substantially the same statute.[5] In that case, the parties' parol agreement that a property be "reconveyed" was judged to be a mortgage, the trial court ordered a foreclosure, and the fore-closed-upon party appealed without permission of the trial court. We explained that the appeal did not violate the statute:

> Although the conveyance is held to be a mortgage, we consider the case properly here. We think the provision in regard to appeals in foreclosure cases applies only to mortgages which are such upon their face, or recognized as such by the parties, and not to cases where the character of the instrument is in issue.

*Id.* In this regard, the statute has not changed since *Herrick* was decided.

¶ 50. We conclude that the same principle applies to this case. Like *Herrick*, the central question in this case was whether the parties contract in fact constituted a mortgage[6] — this was not a run-of-the-mill foreclosure action. We therefore do not read

---

[4] The statute is implemented procedurally by our rules. See V.R.C.P. 80.1(m); V.R.A.P. 6(a). Thus, defendant framed his argument as: plaintiffs failed to seek permission to appeal within ten days as required by Rule 80.1(m). Rule 80.1(m) applies only where "the permission to appeal [is] required by law." As we state in the text, permission is not required by law in this case.

[5] At the time of the decision, the statute read in relevant part: "A party may by a written motion, filed at the term in which a final order or decree is made, appeal therefrom to the supreme court, except . . . when the decree is for the foreclosure of a mortgage, unless by permission of the court." V.S. § 981 (1894).

[6] Unlike *Herrick*, the appellants here are the party seeking to construe the agreement as a contract for deed. We are not convinced that this difference is critical. The important point is that that case was not initiated with a pleading of foreclosure. Furthermore, defendant has filed a cross-appeal, and "notice of appeal from the decree brings the whole case, including all questions litigated in the court

12 V.S.A. § 4601 to bar plaintiffs' appeal because the trial court did not grant permission for it.

¶ 51. Since we have found that the contract was a contract for deed, that it satisfied the Statute of Frauds, and that plaintiffs did not abandon their equitable interest, it is therefore clear that the relationship between the parties was that of mortgagor and mortgagee. Having found that relationship, the court proceeded to consider foreclosure of the mortgage based on plaintiffs' breach. See *Ross v. Shurtleff*, 55 Vt. 177, 181 (1882) (foreclosure of a mortgage "in whatever form it may exist" is a proper matter for a court of equity). Plaintiffs argue that the court's action was error because defendant relied solely on a landlord and tenant theory and never sought foreclosure. The trial court responded to that argument as follows: "Although [defendant] has not sought to 'foreclose,' [plaintiffs] have sufficiently pled the issue for the court to enter a foreclosure order if it becomes necessary." Apparently, the court was relying on plaintiffs' complaint, which characterized the original contract as a mortgage and sought as relief a declaration that "plaintiffs to own equitable title to the building."

¶ 52. Not only did defendant not make a counterclaim for foreclosure, he based his case entirely on the theory that the contract in question was a lease option. Defendant contends that foreclosure was nonetheless appropriate pursuant to Vermont Rule of Civil Procedure 54(c), whereby "every final judgment' shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."[7] That rule represents the general power of a court sitting in equity. See Reporter's Notes, V.R.C.P. 54(c) ("The provision for judgments other than by default provides for all cases the flexibility inherent in the general prayer for relief formerly permitted in chancery."); *Bell's Adm'r v. St. Johnsbury & Lake Champlain R.R.*, 85 Vt. 240, 245, 81 A. 630, 631 (1911).

---

below which affect the final decree, if they are briefed, to this Court for review." *Century Indem. Co. v. Mead*, 121 Vt. 434, 436, 159 A.2d 325, 327 (1960).

[7] Besides Rule 54(c), defendant also relies on Vermont Rule of Civil Procedure 15(b), which provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The court did not rely on this rule, and we cannot conclude that the parties gave express or implied consent to consideration of foreclosure.

¶ 53. Despite the breadth of the language of the rule, our decisions have imposed limits on its use. Our chief precedent is *Johnson & Dix, Inc. v. Springfield Fuels, Inc.*, 131 Vt. 156, 159-60, 303 A.2d 151, 153 (1973), which clarified that for due process reasons of notice and opportunity to defend, any unpled remedy must be within the "ambit of the controversy being litigated." Furthermore, relief cannot be granted if the party against which it is granted was prevented from raising appropriate defenses or submitting evidence because it did not know that that remedy was being considered. An example of the application of this principle is *Laquerre v. Martin*, 139 Vt. 159, 423 A.2d 840 (1980), in which the original defendants had brought in third-party defendants, and the trial court granted judgment against the third-party defendants, but not the original defendants, despite the fact that the plaintiffs had never sought judgment against the third-party defendants. This Court noted that, as a result, the third-party defendants lost a defense of expiration of the statute of limitations, which they could not raise against the original defendants but could raise against the plaintiffs. *Id.* at 161, 423 A.2d at 841. This Court applied *Johnson & Dix* to hold that the trial court had gone beyond the ambit of the controversy being litigated and that "[s]ubstantial justice" required reversal of the judgment against the third-party defendants. *Id.* at 161, 423 A.2d at 841-42.

¶ 54. Rule 54(c) is identical to Federal Rule of Civil Procedure 54(c). In *Albemarle Paper Co. v. Moody*, the U.S. Supreme Court construed the word "entitled" in the rule so that it may not apply if a party's "conduct of the cause has improperly and substantially prejudiced the other party." 422 U.S. 405, 424 (1975). Essentially, plaintiffs have argued prejudice in this case.

¶ 55. While we would not hold that Rule 54(c) is inapplicable to all foreclosure claims, we note the likelihood of prejudice that arises from such an application. Unlike virtually all other civil actions, foreclosure has specific pleading and processing requirements that ensure consideration and resolution of a number of issues. See V.R.C.P. 80.1. Although it might have been possible for the trial court to have announced that it was proceeding to foreclosure and then given defendant an opportunity to submit a pleading in compliance with Rule 80.1(b), and plaintiffs an opportunity to raise issues with respect to the time for redemption, V.R.C.P. 80.1(e), the need for an accounting, V.R.C.P. 80.1(f), and

the opportunity for foreclosure by sale, V.R.C.P. 80.1(h), there was no such notice here. As a result, the situation is similar to that in *Laquerre,* albeit for a different reason. Plaintiffs lost important rights because they had no opportunity to address them.

¶ 56. One of the main lost rights involved the time for redemption. The governing statute provided that the time for redemption "shall be six months from the date of the decree unless a shorter time is ordered." 12 V.S.A. § 4528.[8] Under Rule 80.1(e), "[m]otions to shorten the time for redemption may be filed and served with the complaint or at any time during the course of the proceedings. Such motion shall be heard on oral testimony, unless otherwise ordered by the court, with reasonable notice to those parties who have appeared." The considerations for the court in determining whether to shorten the redemption time are in the statute: "The court shall fix the period of redemption taking into consideration whether there is value in the property in excess of the mortgage debt and debt owed to junior lienholders, any assessed but unpaid property taxes, the condition of the property, and any other equities." 12 V.S.A. § 4528. Here, there was no motion, no oral testimony, and no notice of consideration of the issue. The court shortened the time for redemption without giving a reason for its action. There is no indication that the court considered the factors itemized in the statute, or "any other equities" as also mentioned in the statute. Plaintiffs were thus prejudiced by the lack of opportunity to address the issue.

¶ 57. The same is true of the opportunity for foreclosure by sale. The statute provides:

> All liens and mortgages affecting real property may, on the written motion of any party to any suit for foreclosure of such liens or mortgages, or at the discretion of the court before which the foreclosure proceedings are pending, be foreclosed by a judicial foreclosure sale, even if the mortgage does not contain a sale provision instead of a strict foreclosure.

---

[8] In 2012, the Legislature repealed, effective July 1, 2012, the preexisting foreclosure statute and substituted chapter 172 of Title 12, 12 V.S.A. §§ 4931-4970, applicable to "any mortgage foreclosure proceeding instituted after" the effective date. 2011, No. 102 (Adj. Sess.), § 6(1). The statutory cites in the text are to the statutes before the 2012 repeal.

*Id.* § 4531(a). Consistent with long-standing Vermont law, the norm is strict foreclosure. See *In re Willette*, 395 B.R. 308, 316-18 (Bankr. D. Vt. 2008). See generally K. Riedl, Note, *The Relation of the Equitable Doctrine of Subrogation to Vermont's Strict Foreclosure Laws*, 7 Vt. L. Rev. 71, 77-80 (1982). The statute provides opportunities to require a sale and avoid strict foreclosure. It allows a party to move for a sale, and the court must order a sale in certain instances and may allow a sale where there is no requirement. Here, to their prejudice, plaintiffs had no opportunity to make such a motion.

¶ 58. Less important in this case, but also a source of potential prejudice, was the absence of the accounting provided by V.R.C.P. 80.1(f). Based on defendant's evidence of what payments plaintiffs had made, and when the payments were made, the court was able to calculate the amount owed under the contract as modified. Plaintiffs do not contest this amount. To the base amount, the court added interest from the date of the last payment in January 2007. Plaintiffs contest the addition of interest, arguing that the redemption amount should not include interest because defendant has offsetting income from renting the premises after plaintiffs gave up possession. Interest on an amount owed is a normal component of a judgment based on a breach of contract, see V.R.C.P. 54(a), and is particularly authorized in the mortgage foreclosure context. V.R.C.P. 80.1(f). Any rent obtained by leasing the property would not be an offset against interest. Plaintiffs argue that they were not aware that an accounting was occurring and may have offered evidence for that purpose. We do not see what evidence they could have offered, except to contest the evidence of defendant, and they had ample opportunity to raise that contest.

■■■ ¶ 59. As in *Laquerre*, we hold that "substantial justice" requires a reversal of the foreclosure judgment and a remand for further proceedings, which may include proper pleading and consideration of at least the issues discussed above. Plaintiffs were prejudiced by the court's sua sponte introduction of foreclosure into the case, and Rule 54(c) does not in this case allow consideration of this remedy.

¶ 60. Finally, we turn to the issue of whether the conditional damages for waste ordered by the trial court were appropriate.[9] The court awarded $4036 in damages for cleaning and repairs, and $4100 for personal property and liquor taken by plaintiffs. The initial contract described the property as "the Brewski Pub, building, lot and equipment." Attached to it were lists of equipment and liquor transferred to plaintiffs. Defendant testified to the equipment and liquor on the list not found in the building when he reentered. The court's award was apparently based on that testimony. The court stated, "These are damages which could be recovered in an action for waste and the court treats them as such."[10]

¶ 61. Our precedents establish, and plaintiffs acknowledge, that the doctrine of waste applies to the mortgagor-mortgagee relationship. See *Whiting v. Adams*, 66 Vt. 679, 687, 30 A. 32, 33 (1894). Indeed, it has been applied in other jurisdictions to precisely the situation confronted here: when a purchaser defaults on payments for a contract for deed, the seller may bring an action for waste for damage to the property during the purchaser's occupation of such. See, e.g., *Vogel v. Pardon*, 444 N.W.2d 348, 349 (N.D. 1989). The crux of plaintiffs' disagreement with the trial court's order, then, is not that they could not have committed waste, but rather that there was no evidence of the diminution in value of the property, the measure of damages for waste.

¶ 62. The traditional common law concept of waste, in Vermont and many other jurisdictions, requires a permanent diminution in property value. "The general principle is that the law considers every thing to be *waste* which does a permanent injury to the *inheritance*." *Keeler v. Eastman*, 11 Vt. 293, 294 (1839); see, e.g., *Mannick v. Wakeland*, 2005-NMCA-098, ¶ 15, 117 P.3d 919 (to constitute waste, an "act must be to the *prejudice of*

---

[9] The damages were conditional in that defendant would receive them only if plaintiffs did not redeem. Since we have reversed and remanded the mortgage foreclosure decree, the conditional award is not in effect. We reach the issues raised with respect to these damages because they are almost certain to arise again on remand.

[10] We recognize that the concept of waste may not fully cover the damages for some of the items of personal property, particularly the liquor. Plaintiffs' arguments have not, however, distinguished between the damage to the building and fixtures and the taking of personal property. As a result, we have not addressed any differences in theory of recovery for the latter items.

*the estate or interest* therein of another" (emphasis added)); *Judy v. Judy*, 712 S.E.2d 408, 411 (S.C. 2011) ("'Waste may be committed by acts or omissions which tend to the lasting destruction, deterioration, or material alteration of the freehold and the improvements thereto or which diminish the permanent value of the inheritance.'" (quoting *Wingard v. Lee*, 336 S.E.2d 498, 500 (S.C. Ct. App. 1985))). Based on this principle, the traditional measure of damages in a claim for waste has been the reduction in property value beyond that caused by normal wear and tear. See *Lustig v. U. M. C. Indus., Inc.*, 637 S.W.2d 55, 58 (Mo. Ct. App. 1982) ("[T]he proper measure of damages in an action for waste is the difference in value of the freehold estate or inheritance before and after the waste."); *Meyer v. Hansen*, 373 N.W.2d 392, 396 (N.D. 1985).

¶ 63. The requirement of "permanent injury" goes together with a measure of damages based on before-and-after value. Nevertheless, even the Court in *Keeler* was not willing to draw a bright line to determine what acts constitute waste. See *Keeler*, 11 Vt. at 294 ("We are not aware of any decisions in the courts of this state, laying down any precise rules establishing what acts shall constitute *waste*; and, indeed, it is difficult there should be any."). In practice, it is very common for courts to find waste in situations where the damage to the property consists of removal of fixtures or neglect of the premises, conditions that can be remedied and, therefore, are not permanent injuries. See, e.g., *Johnson v. Nw. Acceptance Corp.*, 485 P.2d 12, 16-17 (Or. 1971) (approving an award of damages for removed fixtures and the damage to the building caused by their removal, stating that "proof of . . . diminution of value can be made by introducing the cost of repairs"). Some jurisdictions have even reframed their inquiries away from the search for permanent injury to property value. See, e.g., *Meyer*, 373 N.W.2d at 395 ("Waste may be defined as an unreasonable or improper use, abuse, mismanagement, or omission of duty touching real estate by one rightfully in possession, which results in a substantial injury.").

¶ 64. The question for us to determine, of course, is whether Vermont is one of those states that considers waste to include more than permanent injury to property value. Although no case has clearly stated this, Vermont has implicitly placed itself in that group of states. We have found waste where the only

damages were holes and nails in walls, broken windows, a damaged light, and a scratched door — all clearly repairable. *Prevo v. Evarts*, 146 Vt. 216, 218, 500 A.2d 227, 228 (1985). In *Turgeon v. Schneider*, 150 Vt. 268, 553 A.2d 548 (1988), we approved a trial court's jury instructions relating to waste that "while defendants were in lawful possession of the farm, they had a duty to take care of the farm and the equipment therein and return it to plaintiffs in substantially the same condition as when their occupancy began, reasonable wear and tear excepted." *Id.* at 277, 553 A.2d at 553. The fact that the instruction included the care of the equipment, which could of course have been replaced, as well as the fact that the approved damage award also included the cost of reseeding the fields, *id.* at 273-74, 553 A.2d at 551-52, suggests that to qualify as waste, damage to the property need not be permanent.

¶ 65. By this decision, we explicitly define waste to include repairable damage to property. Thus, we affirm the trial court's finding that plaintiffs' removal of items and neglect of the property constituted waste because they constituted a substantial injury to the property, even though they could be repaired and replaced so as to avoid a permanent diminution of property value.[11] As plaintiffs have not contested any other element of the doctrine of waste, we need not reach other elements.

¶ 66. We next turn to the question of computation of damages. If we recognize repairable damage to property as waste, we necessarily must allow the cost of repair as a measure of damages. Thus, we join the "[s]everal states [that] . . . allow an injured party to establish damages for waste by showing *either* the before-and-after difference in fair market value or by the reasonable cost of repair." *Bell v. First Columbus Nat'l Bank*, 493 So. 2d 964, 969 (Miss. 1986) (citing *Meyer*, 373 N.W.2d at 396); see also *Eleopulos v. McFarland & Hullinger, LLC*, 2006 UT App 352, ¶ 11, 145 P.3d 1157 ("The measure of damages for waste is established by showing either the difference in market value

---

[11] Defendant points out that his contract with plaintiffs contained a clause referring to waste. "[L]ike many others, the obligation to prevent waste may be affected by contract." *King's Court Racquetball v. Dawkins*, 62 S.W.3d 229, 233 (Tex. Ct. App. 2001). In this case, however, the clause serves merely to clarify that the doctrine of waste, as described here, can appropriately be applied to maintenance of equipment and to the property itself.

before and after the injury, or the cost of restoration." (quotation omitted)); *Three & One Co. v. Geilfuss*, 504 N.W.2d 393, 397 (Wis. Ct. App. 1993) ("Where an injury to property is easily repairable and the cost of restoration is readily ascertainable, the cost of repair is the preferred method of calculating damages."). In line with those states, we hold that the computation of damages for waste in Vermont can be based either on a demonstration of diminution of property value or on the cost of repairs and/or replacement of removed objects. The trial court did not err in its computation of waste, as it included the cost of cleaning and repairing the premises, as well as replacing the items that plaintiffs removed when they vacated.[12]

¶ 67. As a final note, plaintiffs contend that the trial court "went beyond the pleadings" in making this award of damages, based on the fact that defendant did not counterclaim for waste. Although defendant did not use the word "waste" in his counterclaim, he sued for damages based on the damage to the property effected during plaintiffs' time in possession, and plaintiffs were given ample time to respond to the evidence presented. The trial court, in making its decision, clarified that the damages award was one for waste, but did not reach any questions beyond the pleadings. This is not at all like the court's foreclosure ruling, where the court awarded a remedy that was not pled or fully litigated.

¶ 68. For these reasons, we affirm the trial court's rulings that the agreement was a contract for deed, that the modifications were enforceable under the Statute of Frauds, that plaintiffs had an equitable interest in the property, and that they did not abandon that interest. We also hold that this matter is properly before us, despite noncompliance with 12 V.S.A. § 4601, and affirm the conditional award for damages for waste. We remand, however, for a new foreclosure proceeding.

*Affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this decision.*

---

[12] In response to plaintiffs' contention that there was no evidence of the condition of the premises when they first took possession, the trial court appropriately took this into account when declining to award the full amount of labor costs claimed by defendant.

Defendant in his cross-appeal argues that the court erred in failing to award the full amount of the labor costs. We believe that the court acted within its discretion and affirm its damage amount.