NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 64

No. 2015-268

| | |
|---|---|
| Mongeon Bay Properties, LLC | Supreme Court |
| | |
| v. | On Appeal from<br>Superior Court, Chittenden Unit,<br>Civil Division |
| | |
| Mallets Bay Homeowner's Association, Anthony J. Sineni<br>and Merrimack Mortgage Company | March Term, 2016 |

Dennis R. Pearson, J.

David H. Greenberg, Burlington, for Plaintiff-Appellant.

David D. Aman of Heilmann, Ekman, Cooley & Gagnon, Inc., Burlington, for
  Defendant-Appellee Malletts Bay Homeowner's Association, Inc.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **ROBINSON, J.**   This case calls upon us to determine whether, and under what circumstances, a court may decline on equitable grounds to enforce a provision in a long-term ground lease giving the lessor the right to terminate the lease and reenter the premises in the event of a default.  Plaintiff Mongeon Bay Properties, LLC (MBP) sued defendant Mallets Bay Homeowner's Association seeking to void a multi-year ground lease for property abutting Lake Champlain on account of alleged breaches of the covenants in that agreement.[1]  After a bench trial, the trial court concluded that the Association had violated its obligations under the lease by failing to reasonably maintain the embankments abutting Lake Champlain to protect them from

---

[1]  MBP also sued one individual camp owner, Anthony J. Sineni, III, and a mortgagor with an interest in that camp.  The trial court dismissed MBP's claims, as well as various cross claims and counterclaims involving Sineni, and we do not consider them on appeal.

erosion. However, the court declined to enforce the forfeiture clause in the lease against the Association, and awarded MBP damages to enable it to undertake the necessary restoration and bank protection. The Association appeals the trial court's ruling that it breached the lease, and MBP appeals the trial court's award of damages in lieu of forfeiture. We affirm the trial court's determination that the Association breached the lease, but reverse its refusals to declare termination of the lease and to issue a writ of possession to MBP. We remand for reconsideration of MBP's remedy.

¶ 2. The trial court made the following findings. There are over twenty-five camps within the Association, ten of which are situated immediately on the shore of Lake Champlain at the eastern edge of Malletts Bay, all perched above a twenty to twenty-five foot embankment, on a strip of land just west of East Lakeshore Drive in Colchester. The Mongeon family owned the entire land parcel on which these camps were built, and built many of the camp structures. Over time, what had been camp rentals became seasonal residences owned by camp occupants, although the underlying land continued to be owned by the Mongeon family.

¶ 3. In October 1995, members of the Mongeon family set up a partnership to own the land under the camps, and the partnership entered into a ground lease with the Association. That lease encompassed the entire parcel on which all of the subject camps were located, and provided that the Association would pay $28,000 per year for the first year, and then annual increases calculated by adding any increase in property tax applicable to the parcel and an annual increase based on the consumer price index. That twenty-five year lease was set to expire in April 2021.

¶ 4. In December 2002, the parties extended the ground lease, adding fifteen years to the term so that it would expire in 2036. There have been some changes to the Mongeon family side of this ground lease, and MBP is now the 100% owner of the underlying land and is the sole lessor in the ground lease. This lease is between MBP and the Association; there are not individual leases between MBP and any camp owners within the Association.

¶ 5.     The annual lease payment was intentionally set at what might be considered below-market"' rates to allow camp owners to maintain their individual properties, as well as the land and overall grounds.  Most recently, the monthly Association payment by each camp owner, to cover the annual ground rent plus insurance and other expenses, was $290 per month.  The Association is current with all required lease payments.

¶ 6.     Among other things, the lease provides:

> In no event shall the Lessee do or permit any act or thing which might (1) impair the value or usefulness of the Land or any part thereof, or (ii) constitute a public or private nuisance or violation of law. . .
>
> The Lessee at its expense will keep the Land and premises in good and clean order and condition and will make all necessary or appropriate steps to keep them in good condition.  The Lessee shall not permit the land to be overloaded, damaged, stripped, or defaced, nor suffer any waste.
>
> The lessee will protect, indemnify and save harmless the Lessor from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses . . . imposed upon or incurred by or asserted against Lessor or against the Land by reason of the occurrence or existence of any of the following . . . (d) any failure on the part of the Lessee to perform or comply with the terms of this Lease.

At the end of the lease term, the Association is required to surrender the land "in good order and condition."

¶ 7.     The lease includes as an "Event of Default" the following:

> [I]f the Lessee shall fail to perform or comply with any terms of this Lease . . . and such failure shall continue for more than 45 days after the Lessee receives notice or [has] knowledge of such failure. . . .

With respect to remedies for default, the lease states:

> [I]n the event that an Event of Default shall have occurred, [and] upon issuance of a writ of possession, the rights of the Lessee . . . shall immediately cease and become void.
>
> If any event of Default shall have occurred and be continuing, whether or not the term of this lease shall have been terminated pursuant to the Lease, the Lessor may enter upon and repossess the

3

Land or any part thereof pursuant to Vermont law. If any Event of Default occurs, Lessee shall be responsible for all of Lessor's attorney's fees and costs of litigation.

¶ 8. In the spring of 2011, the surface level of Lake Champlain reached its highest-ever recorded level, causing widespread damage along the eastern lakefront including Malletts Bay. Below the ten camps situated on the edge of Lake Champlain, there is a significant slope running down to the water's edge, and the then-existing seawall protection was spotty at best. The area below the ten camps was significantly impacted by the spring flooding. The injury to and impact on the land owned by MBP as a result of this flooding was likely greater than it would have been, even from the unusual confluence of otherwise natural events, because of the lack of adequate seawall protection at the foot of the embankment area, lack of appropriate bank stabilization, and inadequate vegetation and other erosion control measures on the bank itself. The ongoing erosion problems along the affected embankment were and are preventable by reasonable and ordinarily required repairs and upkeep that the Association was obligated to perform under the ground lease terms.

¶ 9. The land around the camp at 937 East Lakeshore Drive was particularly damaged, and the pre-existing stairway down to the lake located by that camp was in danger of immediate collapse. The lease expressly requires the Association to maintain the stairway. After the individual camp owner and the Association collectively failed to address the issue in the summer of 2011, the Town of Colchester began to have more serious discussions with the camp owner about stabilizing the bank by his house.

¶ 10. In September 2011, MBP through counsel sent the Association a notice of default under the ground lease. The letter cited the Association's "failure to maintain the retaining walls on [the] waterfront, undermining camps and creating hazard of collapse and bodily injury and causing a diminution in the value of the property."[2] In this letter, MBP gave the Association

---

[2] MBP's letter identified several other claimed defaults. Because the trial court rejected these other defaults as minimal, if proven at all, we do not recount them here.

forty-five days to cure the defects. In December 2011, after the parties and counsel had met to discuss the matter, the Association by letter denied that any default existed. It took no steps to remedy the situation within forty-five days of MBP's notice of default.

¶ 11. In the meantime, the Town issued the owner of the camp at 937 East Lakeshore Drive a notice of violation of Town ordinances alleging that his structure was "unsafe and constitutes a potential hazard" because the rear porch had lost part of its foundation and was partially detached from the structure. The Association was alerted to this. Neither the camp owner nor the Association took any action within thirty days of the Town's notice of violation.

¶ 12. MBP then filed this suit against the Association in January 2012 seeking damages and a declaration that the ground lease is void and forfeited because of the Association's violations.

¶ 13. For most of the time since the inception of the lease, and until the latest events regarding the severe bank erosion in the spring of 2011, the Association, and its directors and officers, as well as apparently most camp owners, who are also Association members, have taken the position that each individual camp owner is solely responsible for all repairs to and maintenance of that owner's structure, including adjacent grounds and more particularly the embankment alongside the ten camps fronting the lake on the west side of East Lakeshore Drive. This "understanding" was almost universally held within the Association, despite the clear obligations the ground lease imposes on the Association collectively, and not on individual camp owners, to prevent waste or damage to the land. The parties' stipulation in late February 2012 that the Association would undertake collective action to address the particular bank erosion and ground stability issues at 937 East Lakeshore Drive that were the subject of the Town's notice of violation represented the Association's first real recognition of its duties as lessee and a major shift in the Association's prior position and understanding. It would not have happened but for the Town's pursuit of alleged violations and MBP's threat of default.

5

¶ 14.    After MBP filed suit, in April 2012 the Town issued a second notice of violation regarding the property at 937 East Lakeshore Drive, this time directed to the Association. The Association retained an excavating contractor who dumped three to four cubic yards of unscreened topsoil over the bank and spread it around and seeded it with some geotextile matting. There was no engineering plan for this work, it did not include any removal of the failed foundation at the back end of the camp, and it did not include any structural stabilization to the embankment or addition of any riprap or other seawall-type protection at the lake level. The work was inadequate and failed to address or correct the issues that were the basis for the Town's notice of violation.

¶ 15.    The Association then hired a different contractor who pulled out the failed foundation with cables, installed large boulders at the foot of the embankment to create a seawall for this particular lot, and installed a new swale, with riprap, running diagonally across the slope to carry runoff from the paved parking area adjacent to the camp at 937 East Lakeshore. But there was no plan to tie this work to an integrated approach to dealing with all of the runoff coming from the roofs of the camp structures. This work was completed in 2013 and satisfied the Town in connection with its notices of violation.

¶ 16.    However, the 2013 work was primarily for immediate stabilization, and not long term restoration. By the summer of 2014, it was apparent that the more extensive repair work in 2013, while perhaps addressing the Town's violation notices, was still inadequate for the purposes of the ground lease. The work did not entirely remediate the bank erosion issues immediately beneath the camp at 937 East Lakeshore Drive, and by 2014 that work was already failing in part. For that reason, MBP retained its own engineering consultant to prepare an alternative plan for embankment stabilization and improvements not just for the camp at 937 East Lakeshore Drive, but for many of the other camps on the lakeshore.

¶ 17.    MBP's proposed embankment plan involved remediation and restoration of the embankment below the five camps to the south of 937 East Lakeshore. These camps also have

6

inadequate or failing embankment protection. Either there is no seawall protection at all, or what was there is old and failing and positioned at an incorrect elevation. Existing vegetation and/or riprap are inadequate to protect against soil erosion, and erosion has occurred beyond normal conditions, although the amount of ground soil that has been lost cannot be quantified because there is no baseline data. The proposed plan would integrate the drainage and runoff system around the structure at 937 East Lakeshore into a comprehensive system that collects and discharges the water at the lake level itself, at or below the toe of any seawall. MBP's engineers estimated that the "ballpark" cost of the proposed remediation and restoration would be $93,150-$164,150. The Association's engineer estimated that remediation and restoration of the bank would cost $78,000. The trial court found the work proposed by MBP's engineer more thorough and detailed, and more likely to result in a longer-term solution to ongoing and continuing bank erosion problems. It assessed the cost of that work at $128,640, representing the mid-point of the MBP engineer's estimated cost range.

¶ 18. Based on these findings, the trial court explained that as lessor of the long-term ground lease, MBP has no interest in the camp structures on that land. Its primary interest under the lease is return of the land itself at the end of the lease in substantially the same condition as when the lease was initiated, absent "normal wear and tear" that would reasonably be expected over the forty-year lease term. The trial court concluded that the Association's failure to adequately address lakeside erosion, causing substantial injury to the leased property, amounted to "waste." In reaching this conclusion, it rejected the Association's argument that MBP's failure to raise the issue of bank stabilization with the Association at any earlier time in the course of the ground lease demonstrated, on the basis of the parties' course of dealing, that the Association had no obligation under the ground lease to maintain the embankments.

¶ 19. Despite its ruling in MBP's favor on the question of default, the trial court did not award MBP the relief it sought—namely, lease forfeiture. The court explained, "[L]ease forfeiture here would be especially inequitable, and a sanction entirely out of proportion to the

7

lease violations" involving the Association's failure throughout the term of the lease to adequately protect and stabilize the bank along the lakeshore. Concluding that an award of damages for remediation would afford adequate relief, the court awarded MBP a judgment for $135,000—the expected cost of remediation and restoration of the bank—and left MBP with the responsibility for conducting the repair work along with a corresponding right to enter the premises for the purpose of doing the work.

¶ 20. The trial court concluded that MBP was clearly the prevailing party on the principal dispute at trial, and was entitled to an award of attorney's fees and costs on the basis of the ground lease. It indicated that it would entertain a post-judgment motion for fees before determining the specific fee award.

¶ 21. Both parties appealed. The Association contests the trial court's conclusion that it breached its obligations under the ground lease and challenges the trial court's ruling that MBP is entitled to an award of attorney's fees and costs. MBP appeals the trial court's remedy, most particularly its refusal to terminate the ground lease on the basis of the established default.

¶ 22. On review, we will uphold the trial court's findings as long as they are supported by any credible evidence in the record, and we review questions of law without deference to the trial court. Currie v. Jane, 2014 VT 106, ¶ 19, 197 Vt. 599, 109 A.3d 876.

## I. The Association's Appeal

¶ 23. The Association raises a host of challenges to the trial court's holding that it breached its obligations under the ground lease, and contests the trial court's conclusion that MBP is entitled to yet-to-be-determined attorney's fees and costs.

## A. Breach of Lease

¶ 24. With respect to the trial court's conclusion that the Association breached its obligations under the ground lease by failing to adequately address lakeside erosion, the Association makes four arguments: First, the trial court erred as a matter of law in concluding that the lakeside embankment was subject to the ground lease between MBP and the Association.

8

Second, the trial court erred by concluding that the parties' course of dealing did not establish that erosion repair and prevention was outside the scope of the ground lease. Third, the trial court erred by concluding that the bank erosion that the court described as "waste" was not ordinary wear and tear. And fourth, the trial court erred by concluding that the bank erosion constituted waste. We consider these arguments in turn.

¶ 25. First, we find ample evidence in the record to support the trial court's conclusion that the land comprising the lakeside embankment at issue is within the scope of the ground lease between MBP and the Association.

¶ 26. The Association is correct that MBP did not offer deed or survey evidence establishing that the land leased to the Association abuts Lake Champlain. The ground lease entered into evidence describes the land subject to the lease as a parcel on both sides of Lakeshore Drive comprising the land described in a series of deeds identified by book and page in the land records. MBP did not introduce the underlying deeds into evidence or any surveys showing the western border of the parcel subject to the ground lease.

¶ 27. However, uncontroverted testimony and evidence at trial established that the property subject to the ground lease was contiguous with the Lake itself. MBP's manager described some of the camps in question as being on the bank of the Lake, and identified the stretch of beach between the embankment and the Lake as being owned by MBP and part of the ground lease with the Association. The photographs admitted as exhibits show that many of the camps that are undisputedly on land leased by the Association are located on and in some cases overhang the embankment. The ground lease itself specifically provides that the Association is responsible for maintaining and repairing the stairway "from [East Lakeshore Drive] to Malletts Bay" and reserves the right to use that stairway for certain non-Association members. And the Association itself acknowledged that the embankment along the lake is within the scope of the lease. In particular, the Chair of the Association testified that the Association has historically taken the position that individual camp owners are responsible for maintaining the integrity of

9

their bank "because it was considered to be their land, even though we've leased that land." In the face of this evidence, the Association offered no countervailing evidence suggesting that boundary of the lands leased by the Association does not encompass the beach and embankment. This evidence is sufficient to support the trial court's finding that the land along the lake was included in the ground lease. Whippie v. O'Connor, 2010 VT 32, ¶ 12, 187 Vt. 523, 996 A.2d 1154 ("We uphold the trial court's findings as long as they are supported by any credible evidence in the record.").

¶ 28. Second, the trial court acted within its discretion in rejecting the Association's argument that a course of dealing between the parties established that the Association was not obligated under the lease to maintain the bank along the lakeshore. The Association argues that by remaining silent about the Association's asserted to repair or prevent erosion of the banks from the inception of the lease until the fall of 2011, MBP engaged in a course of dealing that demonstrates that the Association was not obligated under the lease to maintain the banks.

¶ 29. The trial court responded with a legal observation and factual findings. Concerning the law, the trial court noted that no legal precept requires a lessor to constantly remind a lessee of its obligations under a lease, especially where it is a long-term commercial ground lease entered into by two sophisticated entities each represented by counsel. On the facts, the trial court concluded that, under the terms of the lease, the Association had an obligation to return the land in substantially the same condition as when the lease was initiated, other than normal wear and tear. The trial court did not credit the Association's argument that the parties' course of dealing, and in particular MBP's silence on the issue prior to 2011, showed that the Association had no obligation to maintain the embankment. Instead, the trial court concluded that MBP's rights were established by the lease, and it was only inspired to act to enforce those rights when the loss of soil and attendant erosion problems became too much to ignore, as evidenced by the Town's notices of violation concerning the camp at 938 East Lakeshore.

10

¶ 30. The trial court's rejection of the Association's argument is legally sound and supported by the evidence. The Association is correct that a course of dealing between parties, such as a series of transactions in which the parties apply or accept certain pricing terms that are otherwise omitted from their agreement, may give meaning to, supplement, or qualify their agreement. Restatement (Second) Contracts § 223(b) (1981). But "course of dealing" must be proved just like any other fact. See Tobias v. N.D. Dep't of Human Servs., 448 N.W.2d 175, 180-81 (N.D. 1989) (considering "course of dealing" argument under North Dakota's Uniform Commercial Code). In this case, there is no evidence of repeated transactions between the parties, or even a course of communications in which MBP accepted or endorsed the suggestion that the Association was not obligated to maintain the embankment. In arguing that the parties' course of dealing informs the meaning of or modifies their agreement, the Association relies entirely on MBP's inaction in failing to assert its rights sooner. The Association's evidence on this point was not so unequivocal as to compel the trial court, as a matter of law, to conclude that the ground lease did not mean what it said on its face, or that the parties had modified their agreement through a course of dealing. The role of the trial court, as factfinder, is to judge the credibility of witnesses and the weight to be given their testimony. See Cameron v. Double A. Servs., Inc., 156 Vt. 577, 582, 595 A.2d 259, 262 (1991). The trial court's rejection of the Association's course-of-dealing argument was within its discretion and supported by the evidence.

¶ 31. Third, the trial court's conclusion that the erosion of the embankment on the leased property went beyond ordinary wear and tear and constituted waste was supported by law and the evidence. We reject the Association's argument that because the erosion was caused by natural processes—namely, waves and rising water levels on Lake Champlain and significant storm events—it must be characterized as ordinary wear and tear.

¶ 32. The law excludes normal wear and tear from the definition of waste. See Prue v. Royer, 2013 VT 12, ¶ 62, 193 Vt. 267, 67 A.3d 895 ("[T]he traditional measure of damages in a

11

claim for waste has been the reduction in property value beyond that caused by normal wear and tear."). The questions of what damage to property amounts to "waste" and what damage constitutes ordinary or normal "wear and tear" thus turn on the same considerations.

¶ 33. Our cases describing the contours of "ordinary wear and tear" establish two closely related guiding principles that are pertinent to this case. First, whether degradation of property represents ordinary wear and tear depends on the reasonableness of the lessee's use of the property with respect to that degradation. Second, the concept is context-dependent and may vary with the use and type of property.

¶ 34. "Ordinary wear and tear" is defined with reference to reasonable conduct by the lessee. Black's Law Dictionary defines "ordinary wear and tear" as "deterioration caused by ordinary use" or "the depreciation of property resulting from its reasonable use." Black's Law Dictionary (10th ed. 2014) (emphasis added); see also 9 V.S.A. § 4451(5) (defining "normal wear and tear" for purposes of residential rental agreements as "the deterioration which occurs, based upon the reasonable use for which the rental unit is intended, without negligence, carelessness, accident, or abuse of the premises or equipment or chattels by the tenant or members of his or her household or their invitees or guests" (emphasis added)).

¶ 35. Accordingly, in Drouin v. Wilson, this Court considered not only the nature of the damage to the property when returned to the landlord, but the cause of the damage. 80 Vt. 335, 343, 67 A. 825, 827 (1907). In that case, a lessee of commercial property returned the leased property with a plate glass window that had broken on account of shifting in the building frame or foundation. This Court concluded that the injury to the plate glass window, "sustained in the proper use of the building," was not an injury for which the lessee was liable. Id. at 344, 67 A. at 827. The fact that the damage occurred even though the lessee was making "proper use of the building" was central to our analysis. Had the breakage resulted from lessee's own conduct, while not using the building properly, the breakage may have amounted to waste and not ordinary wear and tear.

12

¶ 36. The Restatement incorporates this reasonableness requirement, and recognizes accordingly that a lessee may be obligated to take affirmative steps to protect the leasehold from damage resulting from outside forces, including damage inflicted by the elements or unrelated third parties. See Restatement (Second) Property, Landlord & Tenant § 12.2(I) (1977). For example, the tenant of a residential property is required to take reasonable steps to protect the interior of the house from damage resulting from the elements invading the leased property as a result of a blown-out window. Id., cmt. d, illus. 5. If a tenant takes no steps to protect the property, knowing of a fire danger caused by a neighbor's burning leaves on a day when the wind is blowing toward the leased property, the tenant may be subject to damages or termination of the lease on account of fire damage to the leasehold resulting from the neighbor's conduct. Id. § 12.2(2), cmt. g, illus. 20. And a tenant who leaves the leased property unattended, with the doors unlocked and the windows open, is accountable for the damage caused by a third person who enters and damages the leased property. Id.; see also Restatement (First) Property § 139, cmt. c (1936) ("A repair or act of preservation is clearly within such a duty whenever such repair or act is necessary to prevent a progressive deterioration of the land or structures or whenever the condition existing as a result of the failure to make such repair will amount to substantial deterioration of the land or structures from the condition in which such land and structures were at the time of the commencement of the state for life.")

¶ 37. The related point about "ordinary wear and tear" is that its contours depend to some extent on the character and use of the property in question. We have explained, "It is well settled that the age, class, and general condition of the property when taken are to be considered in determining the liability of the tenant" under lease covenants. Drouin, 80 Vt. at 343, 67 A. at 27.

¶ 38. With this legal framework in mind, the trial court's conclusion that the damage to MBP's land exceeded ordinary wear and tear and amounted to waste was well supported by the evidence at trial. The property at issue abuts Lake Champlain. Part of the property forms an

13

embankment from the road down to the lake level. The trial court could reasonably conclude that these facts were relevant to the distinction between "ordinary wear and tear" consistent with reasonable use of the property versus "waste" constituting a breach of the terms of the lease. The trial court heard extensive expert testimony from both parties about what measures were reasonable to secure the property from unreasonable levels of erosion. The recommendations were not extraordinary. MBP's engineering expert testified that it is very common for camps and properties on Lake Champlain to have some form of seawall to protect their frontage, and that camps that do not take these steps progressively lose real estate. MBP's expert also noted the regular maintenance such structures may require. And, the trial court found, and the evidence supported, that the parties to this ground lease set a below market rate to allow camp owners to maintain their individual properties, as well as the land and overall grounds. In short, ample evidence supports the trial court's conclusion that in this case the Association was obligated to take reasonable steps to protect the lakeside property from erosion beyond ordinary wear and tear.

¶ 39. Likewise, the trial court's conclusion that the erosion sustained to date was substantially more than what would have occurred naturally, but for the Association's use and occupation of the leased premises and its failure to install and/or maintain adequate erosion-control measures over many years, is supported by the evidence. MBP's expert attributed the erosion of the embankment to inadequate shoreline protection, and concentrated discharges of runoff from gutters, drains, or pavement. Accordingly, we conclude that the trial court's conclusion that the damage to the property in this case amounted to more than ordinary wear and tear is supported by the law and the evidence.

¶ 40. Finally, we reject the Association's argument that in the absence of a specific finding as to the amount of ground lost due to erosion, above and beyond expected losses attributable to normal wear and tear, the trial court's finding that the erosion amounts to waste cannot stand. Our response includes considerations of law and of the record in this case.

14

¶ 41. With respect to the law, the absence of evidence of the diminution in the value of the land in this case is irrelevant. This Court has held that "waste" may include repairable damage to property and that the cost of repair is an available measure of damages for waste. See Prue, 2013 VT 12, ¶¶ 65-66. Insofar as the Association seems to be arguing that MBP did not introduce any evidence of a reduction in value of the land due to the waste, that argument is factually accurate but legally inconsequential. MBP's proof and theory of recovery was not based on the diminution in value of the property as a result of the eroded banks; it was based on the reasonable cost to repair the embankment and protect it from further waste. See id. ("If we recognized repairable damage to property as waste, we necessarily must allow the cost of repair as a measure of damages.").

¶ 42. With respect to the evidence, findings as to the precise volume of soil that has been lost through excessive erosion are not essential to the trial court's analysis. The trial court found that the embankment protection along a stretch of the property abutting Lake Champlain was failing or inadequate, and that, as a result, the property had undergone substantial erosion beyond what would have occurred with proper stabilization and protection of the embankment. This finding was supported by evidence, and a more precise quantification of the amount of soil lost to erosion was not necessary. Moreover, a determination of the exact amount of soil lost was not essential to the trial court's choice between the competing expert proposals to provide a longer term solution to the ongoing bank erosion problems.

B. Attorney's Fees

¶ 43. The Association challenges the trial court's order that MBP is entitled to attorney's fees and costs on two bases. First, it argues that the attorney fee-shifting provision in the ground lease is unenforceable as a matter of law because it is "unilateral." That is, it allows MBP to collect fees in the event of a breach by the Association but does not offer the Association the same opportunity. Second, it argues that fees are available only in the case of default, and there has been no default here. We decline to adopt a per se rule that unilateral attorney fee-

15

shifting clauses in contracts are unenforceable and reject the Association's second argument largely on the basis of our preceding analysis.

¶ 44. In support of its position that the unilateral fee-shifting provision is unenforceable, the Association cites two authorities—neither of which supports the proposition for which it is cited. One authority relied on by the Association is a law review article that describes the inherent unfairness of one-sided fee-shifting provisions, advocates a legislative approach towards one-sided attorney's fee-shifting clauses, and offers a proposed statute to regulate them. See J. C. Bright, Unilateral Attorney's Fees Clauses: A Proposal to Shift to the Golden Rule, 61 Drake L. Rev. 85, 90-111, 120-26 (2012). Among other things, the proposed statute would reform contracts that contain unilateral fee-shifting provisions so that the fee-shifting in favor of the prevailing party is reciprocal. Id. at 120. This article provides no basis for a court-imposed, across-the-board invalidation of unilateral fee-shifting provisions. In fact, the author's proposed solution—construing such provisions to allow an attorney's fee award in favor of the prevailing party in both directions—would do nothing to advance the Association's position in this case.

¶ 45. The other authority cited by the Association is a decision from the United States District Court for the District of Vermont that calls for strict construction against the drafter of fee-shifting clauses in form contracts drafted by one party to be signed by the party in a weaker position. In re Parker, 269 B.R. 522, 530 (Bankr. D. Vt. 2001). The Association does not argue that the negotiated ground lease in this case is a contract of adhesion, and it seeks invalidation, rather than narrow construction of the fee-shifting provision in that lease. The Parker case provides scant support for the Association's legal argument.

¶ 46. The Association's second argument against the trial court's attorney's fee award is largely a rehash of its arguments on the merits, and fails for the reasons discussed above. The Association also contends that a precondition to an award of attorney's fees is a breach of the ground lease lasting in excess of forty-five days. It argues that it initiated steps to repair the bank

16

at 937 East Lakeshore Drive within days of MBP's notice, and that it cannot be required to fully perform within forty-five days where, as here, delays in the permitting process and seasonal constraints made performance within forty-five days impossible. With respect to the portions of the embankment beyond 937 East Lakeshore Drive, it reiterates its claim that it has no obligation under the ground lease to prevent or repair erosion. We have already rejected this latter argument in discussing the merits above, and the trial court's findings, which are supported by the evidence, do not support the Association's claim that its inability to cure the default at 937 East Lakeshore Drive within forty-five days is due solely to factors beyond its control. See supra, ¶¶ 11-12.

## II. MBP's Appeal

¶ 47. MBP challenges the trial court's award of monetary damages in lieu of terminating the lease and evicting the Association members.

¶ 48. The ground lease provided, "in the event that an Event of Default shall have occurred, [and] upon issuance of a writ of possession, the rights of the Lessee . . . shall immediately cease and become void." It further stated, "[i]f any Event of Default shall have occurred and be continuing, whether or not the term of this lease shall have been terminated pursuant to the Lease, the Lessor may enter upon and repossess the Land or any part thereof pursuant to Vermont law." On the basis of these provisions, MBP sought a declaratory judgment that the lease was terminated and that MBP was entitled to repossess the property, as well as a writ of possession.

¶ 49. Although the trial court concluded that the Association had breached the lease by committing waste, the trial court concluded that forfeiture of the lease—which otherwise extended to 2036—"would be especially inequitable, and a sanction entirely out of proportion to the lease violations." Accordingly, the trial court declined to declare the lease terminated or to issue a writ of possession in favor of MBP.

¶ 50. MBP contends that the trial court lacked the authority to conduct the kind of equitable balancing that it undertook in this case and that the trial court should have enforced the terms of the lease. Alternatively, MBP argues that even if the trial court did have discretion to decline to enforce the forfeiture provision, it exceeded its discretion in doing so here.

¶ 51. The general maxim that forfeiture under a lease is disfavored by law is well established in our cases, but this general statement of policy does not support the suggestion that in the face of an established default and a lessor's timely invocation of a contractual right to terminate, a court may decline to terminate the lease pursuant to its terms. See Osgood v. Cent. Vt. R. Co., 77 Vt. 334, 343-44, 60 A. 137, 140 (1905) (discussing important policy of enforcing parties' contracts)

¶ 52. This Court has often repeated the general proposition that forfeiture under a lease is disfavored by the law. See, e.g., Willard v. Benton, 57 Vt. 286, 289 (1884) ("The law does not favor forfeitures."); Powell v. Merrill, 92 Vt. 124, 127, 103 A. 259, 262 (1918) ("Forfeitures are not favored by the law."); Hinsman v. Marble Sav. Bank, 100 Vt. 48, 50, 134 A. 635, 636 (1926) (Hinsman I) ("Forfeitures are not favored by law, and the mere breach of a covenant does not work a forfeiture, unless it be one that disaffirms or impugns the title of the lessor and tends to defeat the reversion." (citations omitted)); Champlain Oil Co. v. Trombley, 144 Vt. 291, 297, 476 A.2d 536, 539 (1984) ("[F]orfeitures are not favored in equity"); Zurmuhlen v. Uchida, 153 Vt. 165, 168, 569 A.2d 480, 482 (1989) (quoting Hinsman I).

¶ 53. In the context of leases, this general policy against forfeitures has supported several requirements prerequisite to imposition of a forfeiture remedy. First, this Court has held that a breach alone will not support forfeiture absent a "special stipulation" or agreement to that effect. See Powell, 92 Vt. at 127, 103 A. at 262 ("The mere breach of a covenant contained in the lease does not in the absence of a special stipulation, work a forfeiture of the term or give the landlord a right of re-entry.").

18

¶ 54.     Second, this Court has consistently construed forfeiture clauses narrowly, and required strict proof to support a forfeiture remedy.  See id. ("[S]tipulations [for forfeiture] are construed strictly."); Waterman v. Clark, 58 Vt. 601, 605, 2 A. 578, 581 (1886) ("The law does not favor forfeitures.  It will not declare one upon implication.  Strict proof is always required.") Benton, 57 Vt. at 289 ("The law does not favor forfeitures; nor would declare one by implication, but would require strict proof."); see also Palmer's Ex'r v. Ryan, 63 Vt. 227, 228, 22 A. 574, 574 (1891) ("All contracts under which forfeitures are claimed are to be construed strictly to avoid such result.").

¶ 55.     Third, the law requires that the breach supporting a judgment of forfeiture "not be trivial or technical."  Champlain Oil Co., 144 Vt. at 297, 476 A.2d at 539 (citing Houghton v. Cook, 91 Vt. 197, 205, 100 A. 115, 119 (1917)); see also Hinsman I, 100 Vt. at 50, 134 A. at 636 ("Forfeitures are not favored by law, and the mere breach of a covenant does not work a forfeiture unless, it be one that disaffirms or impugns the title of the lessor and tends to defeat the reversion."); Century Partners, LP v. Lesser Goldsmith Enters., Ltd., 2008 VT 40, ¶ 24 184 Vt. 215, 958 A.2d 627 (holding that where tenant's certificate of occupancy violation is technical in nature, landlord may not cause forfeiture of tenancy and removal of tenant on account of such violation unless landlord cooperates in good faith to attempt to cure it).

¶ 56.     And finally, the law requires a timely affirmative act by the lessor to invoke the forfeiture provision.  This requirement is the most developed corollary of the general policy disfavoring forfeiture of leases, and most cases, in Vermont and other states, that cite the policy disfavoring forfeiture of leases, involve this imperative.  For example, in the case of Houghton v. Cook, this Court explained that the breach of a condition in a lease, with the right to enter thereon, does not in itself terminate the lessee's interest.  91 Vt. 197, 203-04, 100 A. 115, 119 (1917).  The Court explained:

> Such a breach is the ground of a forfeiture, but the forfeiture arises
> from the lessor's act.  It is optional with [the lessor] to claim a
> forfeiture or to waive it, and if [the lessor] would treat the breach

19

> as a forfeiture [the lessor] must promptly evince [this] purpose by some distinct and positive act.

Id.

¶ 57.    In Hinsman v. Marble Savings Bank—a case that came to this Court three times—this Court established that a timely action for ejectment is sufficient to invoke the forfeiture provision. Hinsman I, 100 Vt. at 48, 134 A. at 635. In Hinsman I, a tenant bank sublet the leased space to a fruit vendor, and the lessor sought termination of the lease and possession of the premises on account of the bank's alleged breach of the lease. This Court concluded that the sublease may have violated an implied duty in the lease, but that ejectment was not available for breach of a covenant implied by law. Id. at 50, 134 A. at 636. The Court accordingly declined to terminate the lease on account of the bank's sublease.

¶ 58.    The case came back to the Court, this time in connection with the lessor's claim that the bank breached the covenant to use and manage the premises in a good and husbandlike manner. Hinsman v. Marble Sav. Bank, 102 Vt. 217, 147 A. 270 (1929) (Hinsman II). The Court acknowledged that the bank had breached the express covenant for good husbandry, but explained, "[T]he mere breach of a covenant contained in a lease does not, in the absence of special stipulation, work a forfeiture of the term or give the landlord a right of entry, unless (as is not the case here) it is one that disaffirms or impugns the title of the lessor and tends to defeat reversion." Id. at 221, 147 A. at 271. The Court reiterated that it is incumbent on the lessor to claim the forfeiture by promptly evincing such purpose by "some distinct and positive act." Id. The Court acknowledged that the lessor's bringing of an action to recover possession could constitute its reentry, thereby timely terminating the lease, but was unclear as to whether the lessor had invoked the breach of the covenant for good husbandry in the initial ejectment action. Id. at 222-23, 147 A. at 272. It remanded for a determination on that point.

¶ 59.    The third time around, this Court affirmed a judgment for the lessor. Hinsman v. Marble Sav. Bank, 104 Vt. 40, 156 A. 874 (1931) (Hinsman III). On remand the lessor had

20

demonstrated that the initial ejectment action was premised in part on the covenant of good husbandry and was litigated accordingly. This Court reiterated that the bank's breach of the covenant, standing alone, did not work a forfeiture, because a forfeiture requires reentry, an action of ejectment, or some act unequivocally manifesting the lessor's intention to claim the forfeiture and terminate the lease. Id. at 42-43, 156 A. at 875. But having confirmed that the lessor in this case did timely elect the forfeiture remedy by filing an action for ejectment based on the covenant breach, this Court affirmed the judgment for the lessor.

¶ 60. More recently, this Court has relied on the reasoning in the Hinsman cases in denying a landlord forfeiture under a lease. In Zurmuhlen, in November 1985, a commercial tenant made renovations to the leased space without the landlord's approval. In January 1986, the landlord notified the tenant that the renovations violated the lease and offered to renegotiate the lease to reflect increased rent. The letter threatened litigation but did not invoke the forfeiture clause of the lease and did not give the tenant thirty days to cure. Only in March 1986 did landlord give tenant notice of her intent to terminate the lease on the basis of the default. We affirmed the trial court's conclusion that the landlord had waived her forfeiture right by failing to take action to terminate the lease promptly. 153 Vt. at 168-69, 569 A.2d at 489.

¶ 61. Although the law disfavors forfeiture clauses, this Court has never declined to enforce a contractual forfeiture provision when the landlord timely invoked the forfeiture right. Although the Hinsman decisions are frequently cited in support of the policy disfavoring forfeiture, ultimately this Court concluded that the lessor in that case had timely acted to terminate the lease by filing an ejectment action based on the lessee's breach of the lease terms, and thus affirmed a judgment for the lessor. Hinsman III, 104 Vt. at 43-44, 156 A. at 875-76.

¶ 62. Likewise, this Court affirmed a forfeiture in favor of a commercial landlord on the basis of an arguably quite modest default. See Champlain Oil Co., 144 Vt. at 291, 476 A.2d at 536. In Champlain Oil Co., a Champlain Oil Company leased a gas station and store to Trombley. In addition to other terms, the parties' agreement provided that once Champlain Oil

21

finished installing delicatessen equipment in the store, Trombley would begin paying $75.00 weekly against its outstanding gasoline consignment account balance with Champlain Oil, which exceeded $20,000 at that point. The parties' agreement provided that if Trombley failed to perform any of his obligations under the agreement, and such failure continued for a period of seven days, Champlain Oil could lawfully declare termination of the agreement and reenter the premises. Champlain Oil completed installing the equipment on May 11, and Trombley began paying $75.00 weekly against the gas balance sometime in July. Trombley's $75 check for the week of September 16 bounced and remained outstanding for over seven days. This bounced check was the basis for Champlain Oil's termination, request to vacate, and complaint for ejectment. In affirming the ejectment, this Court acknowledged that, "[t]o support a judgment of forfeiture, the breach complained of may not be trivial or technical." Id. at 297, 476 A.2d at 539. And we recognized that "[a] court of equity will generally relieve a party who has not performed [the] contract strictly as to time, unless it appears affirmatively that the parties regarded time as an essential element in their agreement." Id. (quotation omitted). But this Court upheld the ejectment on the basis of the trial court's finding that prompt payment of the $75.00 weekly check was an essential element of the agreement between the parties, and that defendant's failure to timely pay, lasting over seven days, amounted to a material breach. Id. at 297, 476 A.2d at 539-40.

¶ 63. This is a case of first impression insofar as the Association urges us to rely on our general policy disfavoring forfeitures to authorize the trial court to invoke general equitable considerations in declining to enforce a contractual agreement providing for forfeiture in the event of default, even though the lessor timely invoked the clause and elected termination.[3] We decline to do so for several reasons.

---

[3] The Association does not contend that MBP failed to timely terminate the lease on account of the breach. Nor could it. See supra, ¶¶ 9-13. The record reflects that MBP's September 28, 2011 notice to the Association not only enumerated the Association's claimed defaults, but specifically provided the Association with forty-five days to remedy the defaults

22

¶ 64. First, our precedent does not support setting aside clearly applicable, contracted-for remedies. As set forth above, our own cases subject forfeiture claims to close scrutiny. We construe contractual forfeiture clauses narrowly and require strict proof to support a forfeiture. See supra, ¶¶ 54-55. We require the party seeking forfeiture to clearly and timely invoke the remedy. See supra, ¶ 57. And we have cautioned that a trivial or technical breach cannot support a judgment of forfeiture. Champlain Oil Co., 144 Vt. at 297, 476 A.2d at 539. But we have never suggested that in the context of a long-term ground lease negotiated by sophisticated parties, one party may be relieved of the contracted-for consequences of its breach on equitable grounds. As we noted in a related context, the tendency of the law toward expanding contractual defenses "should be regarded with great caution since there is danger that courts, in their desire to relieve parties in hard cases, may go too far." Retail Merchs.' Bus. Expansion Co. v. Randall, 103 Vt. 268, 271, 153 A. 357, 358 (1931). We explained, "[t]he province of courts is to construe and enforce contracts, not to make or modify them." Id.; cf. Finn v. Meighan, 325 U.S. 300, 301 (1945) (explaining that bankruptcy court does not look with favor upon forfeiture clauses in leases, but that express covenant of forfeiture has long been held to be enforceable against bankruptcy trustee).

¶ 65. Second, we rely on the Restatement, which provides that if the tenant makes impermissible changes to the physical condition of the leased property, and the leased property cannot be restored to its former condition, or has not been restored to its former condition promptly after a request from the landlord to do so, the landlord may terminate the lease and

and indicated that if the Association failed to cure the defaults within that time frame MBP could enter and repossess the property and take all lawful steps to terminate the lease. MBP then filed an ejectment claim on January 9, 2012. The delay in invoking the termination remedy that defeated the lessor's claim in Zurmuhlen, and was the subject of this Court's extended inquiry in Hinsman II and Hinsman III, is not an issue in this case.

Moreover, although the trial court concluded in this case that the remedy of forfeiture was disproportionate to the default, the trial court's findings cannot be interpreted to support the conclusion that the breach in this case was "trivial" or "technical." The trial court concluded that the cost of restoring the damaged banks was over $128,000.

recover damages, continue the lease and recover damages, and, in an appropriate case, obtain equitable relief. Restatement (Second) of Property: Landlord & Tenant § 12.2(2); see also id., cmt. h (explaining that landlord can assert above remedies only if tenant does not restore leased property to its former condition promptly, meaning "as rapidly as possible" after request to do so); id. rep. note 10 (noting that Restatement adopts position that termination is available remedy for waste as long as landlord gives tenant opportunity to restore leased property to its former condition before terminating lease).

¶ 66.   The Restatement makes it clear that the election to terminate a lease belongs to the landlord, not the defaulting tenant or the trial court. See id. § 13.1 (stating that if tenant fails to perform valid promise and landlord is thereby deprived of significant inducement to making of lease, if tenant does not perform within reasonable period of time after being requested to do so, landlord may elect to terminate lease and recover damages); id. cmt. c (noting if repairs are needed because tenant has committed waste, landlord's remedies, including election to terminate lease, is in no way restricted by tenant's promise to repair); id. cmt. k ("The lease is not automatically terminated by the tenant's failure to perform a promise. The right to terminate given the landlord under the rule of this section is an option to terminate the lease. The exercise of this option requires that the landlord notify the tenant that [the landlord] has elected to terminate the lease for the failure of the tenant to perform a promise within a reasonable time after being requested to do so."). See id., rep. note 9 ("Where the lease so provides, the right to terminate is widely recognized, for example, for the tenant's failure to repair as promised."). In short, in the face of a default and waste as found by the trial court in this case, the Restatement recognizes that the landlord, not the trial court, is empowered to elect among the available remedies, including termination of the lease pursuant to its terms.

¶ 67.   Whatever inequity might otherwise result from enforcement of a forfeiture provision is considerably mitigated by the opportunity afforded to the lessee to promptly restore the property to its pre-breach condition. See, e.g., Mayflower Assocs. v. Elliott, 81 So.2d 719,

24

720 (Fla. 1955) (en banc) (recognizing that equity may provide relief against forfeiture of long term lease for failure to pay required rent, but that primary condition precedent to relief against forfeiture is that tenant effectively and in good faith tender payment of arrears of rent).  In this case, the trial court found that the Association failed to avail itself of this opportunity, adhering to the unsupportable view that the Association itself, as contrasted with the individual camp owners, had no obligation to restore the property.

¶ 68.　Finally, we note that our statutes have long contemplated the ejectment of tenants on the basis of a breach of a stipulation contained in a lease.  In particular, 12 V.S.A. § 4851 provides, "after breach of a stipulation contained in the lease by the lessee . . . , the person entitled to the possession of the premises may have from the presiding judge of the superior court a writ to restore him or her to the possession thereof."  This Court has recognized that ejectment under this statute "is not confined to forfeitures claimed by reason of nonpayment of rent," and that "[w]here a forfeiture for some reason other than nonpayment is sought . . . the tender [of all rent due] will not abate the action."  Canfield v. Hall, 121 Vt. 479, 482, 484, 160 A.2d 768, 770-71 (1960).  This Court noted, "[t]he defendants by . . . paying money into court as rent, cannot deprive the plaintiffs of their right to ejectment for a breach of other stipulations in the lease."  Id. at 484, 150 A.2d at 771.

¶ 69.　For these reasons, we conclude that on the basis of the trial court's findings that the Association had substantially defaulted pursuant to the terms of the ground lease, and given that MBP timely and clearly asserted its election under the terms of the contract to terminate the lease, on this record MBP was entitled to terminate the ground lease as a matter of law, and is entitled to a writ of possession.

　　　Reversed and remanded for determination of a remedy in light of the above.

FOR THE COURT:

_____
Associate Justice

25